(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## VIRGINIA OFFICE FOR PROTECTION AND ADVO-CACY *v.* STEWART, COMMISSIONER, VIRGINIA DEPARTMENT OF BEHAVIORAL HEALTH AND DEVELOPMENTAL SERVICES, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 09–529.   Argued December 1, 2010—Decided April 19, 2011

Together, the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (DD Act) and the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI Act) offer States federal money to improve, *inter alia,* medical care for persons with developmental disabilities or mental illness.  As a condition of funding, a State must establish a protection and advocacy (P&A) system "to protect and advocate [those individuals'] rights."   42 U. S. C. §15043(a)(1).   A participating State may appoint either a state agency or a private nonprofit entity as its P&A system, but if a state agency it must have authority to litigate and freedom from the control of other state agencies or officers.  Virginia has appointed an independent state agency, petitioner Virginia Office for Protection and Advocacy (VOPA), authorizing it to litigate to secure disabled individuals' rights, free of executive-branch oversight; to operate independently of Virginia's attorney general; and to employ its own lawyers to sue on its behalf.

While investigating patient deaths and injuries at state mental hospitals, VOPA asked respondents—state officials in charge of those hospitals—to produce relevant patient records.  Respondents refused, asserting that a state-law privilege shielded the records from disclosure.  VOPA then filed suit in Federal District Court, seeking a declaration that respondents' refusal to produce the records violated the DD and PAIMI Acts and an injunction requiring respondents to produce the records and refrain in the future from interfering with VOPA's right of access.  Respondents moved to dismiss on the ground

that they are immune from suit under the Eleventh Amendment, but the court held that the suit was permitted by the doctrine of *Ex parte Young*, 209 U. S. 123, which normally allows federal courts to award prospective relief against state officials for violations of federal law. The Fourth Circuit reversed, finding that *Ex parte Young* did not apply because the suit was brought by a state agency.

*Held: Ex parte Young* allows a federal court to hear a lawsuit for prospective relief against state officials brought by another agency of the same State. Pp. 4–13.

    (a) Absent a waiver of sovereign immunity by a State itself or a valid abrogation by Congress, federal courts may not entertain a private person's suit against a State. Pp. 4–5.

    (b) The doctrine of *Ex parte Young,* which establishes an important limitation on the sovereign-immunity principle, is accepted as necessary to "permit the federal courts to vindicate federal rights." *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89. It rests on the premise that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. It does not apply "when 'the state is the . . . party in interest.' " *Id.,* at 101. Pp. 5–6.

    (c) Entertaining VOPA's action is consistent with precedent and does not offend the distinctive interests protected by sovereign immunity. Pp. 6–13.

    (1) *Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535 U. S. 635, held that, in determining the *Ex parte Young* doctrine's applicability, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Id.*, at 645. VOPA's suit satisfies that inquiry. Respondents concede that the action would be proper were VOPA a private organization rather than a state agency. The "general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought," *Pennhurst, supra*, at 107, not who is bringing the lawsuit. This Court applied that criterion in *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S. 261, which held that an Indian Tribe could not invoke *Ex parte Young* to bring what was essentially a quiet title suit that would "extinguish [Idaho's] control over . . . lands and waters long deemed . . . an integral part of its territory." *Id.*, at 282. Respondents have advanced no argument that the relief sought here threatens a similar invasion of Virginia's sovereignty. Pp. 7–9.

    (2) Respondents claim that a State's dignity is diminished when a federal court adjudicates a dispute between its components. But a State's stature is not diminished to any greater degree when its own agency sues to enforce its officers' compliance with federal law than

when a private person does so. Moreover, VOPA's power to sue state officials is a consequence of Virginia's own decision to establish a public P&A system. Not every offense to a State's dignity constitutes a denial of sovereign immunity. The specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent; that does not occur just because a suit happens to be brought by another state agency. Pp. 9–11.

(3) The apparent novelty of this suit is not likely a consequence of past constitutional doubts. In order to invoke the *Ex parte Young* exception, a state agency needs both a federal right that it possesses against its parent State and authority to sue state officials to enforce that right, free from any internal state-government veto; such conditions rarely coincide. In any event, the principles undergirding the *Ex parte Young* doctrine support its extension to actions of this kind. Pp. 12–13.

568 F. 3d 110, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which KENNEDY, THOMAS, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. KENNEDY, J., filed a concurring opinion, in which THOMAS, J., joined. ROBERTS, C. J., filed a dissenting opinion, in which ALITO, J., joined. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–529

VIRGINIA OFFICE FOR PROTECTION AND ADVO-
CACY, PETITIONER *v.* JAMES W. STEWART III,
COMMISSIONER, VIRGINIA DEPARTMENT
OF BEHAVIORAL HEALTH AND DE-
VELOPMENTAL SERVICES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[April 19, 2011]

JUSTICE SCALIA delivered the opinion of the Court.

We consider whether *Ex parte Young*, 209 U. S. 123 (1908), allows a federal court to hear a lawsuit for prospective relief against state officials brought by another agency of the same State.

## I

### A

The Developmental Disabilities Assistance and Bill of Rights Act of 2000 (DD Act), 114 Stat. 1677, 42 U. S. C. §15001 *et seq.*, offers States federal money to improve community services, such as medical care and job training, for individuals with developmental disabilities. See §§15023(a), 15024. As a condition of that funding, a State must establish a protection and advocacy (P&A) system "to protect and advocate the rights of individuals with developmental disabilities." §15043(a)(1). The P&A system receives separate federal funds, paid to it directly. §15042(a) and (b). A second federal law, the Protection

and Advocacy for Individuals with Mental Illness Act (PAIMI Act), 100 Stat. 478, 42 U. S. C. §10801 *et seq.*, increases that separate funding and extends the mission of P&A systems to include the mentally ill. §§10802(2), 10803, 10827. At present, every State accepts funds under these statutes.

Under the DD and PAIMI Acts, a P&A system must have certain powers. The system "shall . . . have the authority to investigate incidents of abuse and neglect . . . if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." §15043(a)(2)(B); §10805(a)(1)(A). Subject to certain statutory requirements, it must be given access to "all records" of individuals who may have been abused, see §15043(a)(2)(I)(iii)(II); §10805(a)(4)(B)(iii), as well as "other records that are relevant to conducting an investigation," §15043(a)(2)(J)(i). The Acts also require that a P&A system have authority to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of" its charges. §15043(a)(2)(A)(i); see §10805(a)(1)(B). And in addition to pressing its own rights, a P&A system may "pursue administrative, legal, and other remedies on behalf of" those it protects. §10805(a)(1)(C); see §15044(b).

A participating State is free to appoint either a state agency or a private nonprofit entity as its P&A system. §15044(a); §10805(c)(1)(B). But in either case, the designated entity must have certain structural features that ensure its independence from the State's government. The DD Act prohibits the Governor from appointing more than one-third of the members of the system's governing board, §15044(a)(2), and restricts the State's ability to impose hiring freezes or other measures that would impair the system's ability to carry out its mission, §15043(a)(2)(K). Once a State designates an entity as its P&A system, it may not change its selection without "good cause."

§15043(a)(4)(A).

Virginia is one of just eight States that have designated a government entity as their P&A system. The Virginia Office for Protection and Advocacy (VOPA) is an "independent state agency." Va. Code Ann. §51.5–39.2(A) (Lexis 2009). Its board consists of eleven "nonlegislative citizen members," of whom only three are appointed by the Governor. §51.5–39.2(B). The remaining eight are appointed by components of the legislature: five by the Speaker of the House of Delegates, and three by the Senate Committee on Rules. *Ibid.* VOPA itself nominates candidates for consideration, and the statute instructs the appointing officials that they "shall seriously consider the persons nominated and appoint such persons whenever feasible." *Ibid.* Board members serve for fixed terms and are removable only by a court and only for specified reasons. See §51.5–39.2(C) and (F); §24.2–233 and 234 (Lexis 2006).

VOPA enjoys authority to litigate free of executive-branch oversight. It operates independently of the Attorney General of Virginia and employs its own lawyers, who are statutorily authorized to sue on VOPA's behalf. §51.5–39.2(A); §2.2–510(5) (Lexis 2008). And Virginia law specifically empowers VOPA to "initiate any proceedings to secure the rights" of disabled individuals. §51.5–39.2(A).

B

In 2006, VOPA opened an investigation into the deaths of two patients and injuries to a third at state-run mental hospitals. It asked respondents—state officials in charge of those institutions—to produce any records related to risk-management or mortality reviews conducted by the hospitals with respect to those patients. Respondents refused, asserting that the records were protected by a state-law privilege shielding medical peer-review materials from disclosure.

VOPA then brought this action in the United States District Court for the Eastern District of Virginia, alleging that the DD and PAIMI Acts entitled it to the peer-review records, notwithstanding any state-law privilege that might apply. It sought a declaration that respondents' refusal to produce the records violated the DD and PAIMI Acts, along with an injunction requiring respondents to provide access to the records and refrain in the future from interfering with VOPA's right of access to them. Respondents moved to dismiss the action on the grounds that they are immune from suit under the Eleventh Amendment. The District Court denied the motion. In its view, the suit was permitted by the doctrine of *Ex parte Young*, which normally allows federal courts to award prospective relief against state officials for violations of federal law. *Virginia* v. *Reinhard*, 2008 WL 2795940, *6 (ED Va., July 18, 2008).

The Court of Appeals reversed. *Virginia* v. *Reinhard*, 568 F. 3d 110 (CA4 2009). Believing VOPA's lawsuit to be an "intramural contest" that "encroaches more severely on the dignity and sovereignty of the states than an *Ex parte Young* action brought by a private plaintiff," the Court of Appeals concluded it was not authorized by that case. *Id.*, at 119–120 (internal quotation marks omitted).

We granted certiorari. 561 U. S. \_\_\_\_ (2010).

## II

### A

Sovereign immunity is the privilege of the sovereign not to be sued without its consent. The language of the Eleventh Amendment[1] only eliminates the basis for our judg-

_____

[1] The Eleventh Amendment reads as follows:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

ment in the famous case of *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), which involved a suit against a State by a noncitizen of the State. Since *Hans* v. *Louisiana*, 134 U. S. 1 (1890), however, we have understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant. *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 779 (1991); see *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 98 (1984). Our cases hold that the States have retained their traditional immunity from suit, "except as altered by the plan of the Convention or certain constitutional amendments." *Alden* v. *Maine*, 527 U. S. 706, 713 (1999). A State may waive its sovereign immunity at its pleasure, *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 675–676 (1999), and in some circumstances Congress may abrogate it by appropriate legislation.[2] But absent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State.

## B

In *Ex parte Young*, 209 U. S. 123, we established an important limit on the sovereign-immunity principle. That case involved a challenge to a Minnesota law reducing the freight rates that railroads could charge. A railroad shareholder claimed that the new rates were unconstitutionally confiscatory, and obtained a federal injunction against Edward Young, the Attorney General of Minnesota, forbidding him in his official capacity to enforce the state law. *Perkins* v. *Northern Pacific R. Co.*, 155 F. 445 (CC Minn. 1907). When Young violated the injunc-

---

[2] We have recognized that Congress may abrogate a State's immunity when it acts under §5 of the Fourteenth Amendment, *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 59 (1996), but not when it acts under its original Article I authority to regulate commerce, *id.*, at 65–66.

tion by initiating an enforcement action in state court, the Circuit Court held him in contempt and committed him to federal custody. In his habeas corpus application in this Court, Young challenged his confinement by arguing that Minnesota's sovereign immunity deprived the federal court of jurisdiction to enjoin him from performing his official duties.

We disagreed. We explained that because an unconstitutional legislative enactment is "void," a state official who enforces that law "comes into conflict with the superior authority of [the] Constitution," and therefore is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." 209 U. S., at 159–160.

This doctrine has existed alongside our sovereign-immunity jurisprudence for more than a century, accepted as necessary to "permit the federal courts to vindicate federal rights." *Pennhurst*, 465 U. S., at 105. It rests on the premise—less delicately called a "fiction," *id.*, at 114, n. 25—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation, and does not apply "when 'the state is the real, substantial party in interest,'" *id.,* at 101 (quoting *Ford Motor Co.* v. *Department of Treasury of Ind.*, 323 U. S. 459, 464 (1945)), as when the "'judgment sought would expend itself on the public treasury or domain, or interfere with public administration,'" 465 U. S.*,* at 101, n. 11 (quoting *Dugan* v. *Rank*, 372 U. S. 609, 620 (1963)).

C

This case requires us to decide how to apply the *Ex parte Young* doctrine to a suit brought by an independent state

agency claiming to possess federal rights.  Although we have never encountered such a suit before, we are satisfied that entertaining VOPA's action is consistent with our precedents and does not offend the distinctive interests protected by sovereign immunity.

1

In *Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535 U. S. 635 (2002), we held that "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Id.*, at 645 (quoting *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in judgment)).  There is no doubt VOPA's suit satisfies that straightforward inquiry.  It alleges that respondents' refusal to produce the requested medical records violates federal law; and it seeks an injunction requiring the production of the records, which would prospectively abate the alleged violation.  Respondents concede that were VOPA a private organization rather than a state agency, the doctrine would permit this action to proceed.[3]

———————

[3]The dissent is mistaken when it claims that applying the *Verizon Maryland* test would mean two of our cases were "wrongly decided." *Post*, at 4 (opinion of ROBERTS, C. J.).  We discuss the first of those cases, *Coeur d'Alene Tribe*, below.  *Infra*, at 8.  As for the second, *Seminole Tribe*, *supra*, it is inapposite.  The reason we refused to permit suit to proceed in that case was that the Indian Gaming Regulatory Act created an alternative remedial scheme that would be undermined by permitting *Ex parte Young* suits; *Congress*, we said, had foreclosed recourse to the doctrine.  See *Seminole Tribe*, *supra*, at 73–76.

Respondents now argue—for the first time in this litigation—that the DD and PAIMI Acts have the same effect here.  We reject that suggestion.  The fact that the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw

We see no reason for a different result here. Although respondents argue that VOPA's status as a state agency changes the calculus, there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff. To be sure, we have been willing to police abuses of the doctrine that threaten to evade sovereign immunity. To do otherwise "would be to adhere to an empty formalism." *Coeur d'Alene Tribe*, *supra*, at 270. But (as the dissent concedes, *post*, at 8 (opinion of ROBERTS, C. J.)) the limits we have recognized reflect the principle that the "general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought," *Pennhurst*, *supra*, at 107, not who is bringing the lawsuit. Thus, *Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury, see *Edelman* v. *Jordan*, 415 U. S. 651, 666 (1974); or an order for specific performance of a State's contract, see *id.*, at 666–667; *In re Ayers*, 123 U. S. 443 (1887).

*Coeur d'Alene Tribe*, on which respondents heavily rely, is an application of this principle. There we refused to allow an Indian Tribe to use *Ex parte Young* to obtain injunctive and declaratory relief establishing its exclusive right to the use and enjoyment of certain submerged lands in Idaho and the invalidity of all state statutes and regulations governing that land. 521 U. S., at 265. We determined that the suit was "the functional equivalent of a quiet title suit against Idaho," would "extinguish . . . the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory," and thus was barred by sovereign immunity. *Id.*, at 282.

—————

funds—which are the chief statutory features respondents point to— does not demonstrate that Congress has "displayed an intent not to provide the 'more complete and more immediate relief' that would otherwise be available under *Ex parte Young.*" *Verizon Maryland,* 535 U. S., at 647 (quoting *Seminole Tribe*, 517 U. S., at 75).

Respondents have advanced no argument that the relief sought in this case threatens any similar invasion of Virginia's sovereignty. Indeed, they concede that the very injunction VOPA requests could properly be awarded by a federal court at the instance of a private P&A system.

2

Respondents and the dissent argue that entertaining VOPA's lawsuit in a federal forum would nevertheless infringe Virginia's sovereign interests because it diminishes the dignity of a State for a federal court to adjudicate a dispute between its components. See Brief for Respondents 23–26; *post*, at 4–8 (arguing that "'special sovereignty interests'" bar VOPA's lawsuit (quoting *Coeur d'Alene Tribe, supra*, at 281)). We disagree. As an initial matter, we do not understand how a State's stature could be diminished to any greater degree when *its own agency* polices its officers' compliance with their federal obligations, than when *a private person* hales those officers into federal court for that same purpose—something everyone agrees is proper.[4] And in this case, of course, VOPA's power to sue state officials is a consequence of Virginia's own decision to establish a public, rather than a private, P&A system. We fail to perceive what Eleventh Amendment indignity is visited on the Commonwealth when, by operation of its own laws, VOPA is admitted to federal

———————

[4] The dissent compares VOPA's lawsuit to such indignities as "cannibalism" and "patricide," since it is a greater "affront to someone's dignity to be sued by a brother than to be sued by a stranger." *Post*, at 9. We think the dissent's principle of familial affront less than universally applicable, even with respect to real families, never mind governmental siblings. Most of us would probably prefer contesting a testamentary disposition with a relative to contesting it with a stranger. And confining one's child to his room is called grounding, while confining a stranger's child is called kidnaping. Jurisdiction over this case does not depend on which is the most apt comparison.

court as a plaintiff.[5]

But even if it were true that the State's dignity were offended in some way by the maintenance of this action in federal court, that would not prove respondents' case. Denial of sovereign immunity, to be sure, offends the dignity of a State; but not every offense to the dignity of a State constitutes a denial of sovereign immunity. The specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent. That effectively occurs, our cases reasonably conclude, when (for example) the object of the suit against a state officer is to reach funds in the state treasury or acquire state lands; it does not occur just because the suit happens to be brought by another state agency. Respondents' asserted dignitary harm is simply unconnected to the sovereign-immunity interest.

The dissent complains that applying *Ex parte Young* to this lawsuit divides Virginia against itself, since the opposing parties are both creatures of the Commonwealth. *Post*, at 7. Even if that were a distinctive consequence of letting this suit proceed in federal court, it would have nothing to do with the concern of sovereign-immunity— whether the suit is against an unconsenting State, rather than against its officers. But it is *not* a consequence of the federal nature of the forum. The same result will follow if the federal claim is sued upon in state court, as the dissent would require. There also, "[w]hatever the decision

––––––––––

[5] The dissent accuses us of circular reasoning, because we "wrongly assum[e] [that] Virginia knew in advance the answer to the question presented in this case." *Post*, at 10. That would be true if we were relying on the Commonwealth's waiver of sovereign immunity. We are not. We rely upon *Ex parte Young*. We say that Virginia has only itself to blame for the position in which it finds itself, not because it consented to suit, but because it created a state entity to sue, instead of leaving the task to a private entity. It did not have to *know* that this would allow suit in federal court. Know or not know, *Ex parte Young* produces that result.

in the litigation, . . . [t]he Commonwealth will win[, a]nd the Commonwealth will lose." *Ibid.* Nor would sending the matter to state court even avoid the prospect that "a federal judge will resolve which part of the Commonwealth will prevail," *ibid.*, since the state-court loser could always ask *this* Court to review the matter by certiorari. (Or is that appeal also to be disallowed on grounds of sovereign immunity? But see *Cohens* v. *Virginia*, 6 Wheat. 264 (1821).)[6] And of course precisely the same thing would happen if respondents specifically waived their sovereign-immunity objections *in this very case.* Yet no one would contend that despite the waiver, sovereign immunity forbade the suit. So also here: If, by reason of *Ex parte Young*, there has been no violation of sovereign immunity, the prospect of a federal judge's resolving VOPA's dispute with respondents does not make it so.

We do not doubt, of course, that there are limits on the Federal Government's power to affect the internal operations of a State. See, *e.g.*, *Printz* v. *United States*, 521 U. S. 898 (1997) (Congress may not commandeer state officers); *Coyle* v. *Smith*, 221 U. S. 559, 579 (1911) (Congress may not dictate a State's capital). But those limits must be found in some textual provision or structural premise of the Constitution. Additional limits cannot be smuggled in under the Eleventh Amendment by barring a suit in federal court that does not violate the State's sovereign immunity.[7]

————————

[6] The dissent agrees that because of the "'constitutional plan,'" *post,* at 8, n. 3 (quoting *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation*, 496 U. S. 18, 30 (1990), this Court can adjudicate disputes between state agencies without offending sovereign immunity. But explaining away exceptions to its theory does not advance the ball. It has not demonstrated that sovereign immunity has anything *at all* to say about federal courts' adjudicating interagency disputes.

[7] We have no occasion to pass on other questions of federalism lurking in this case, such as whether the DD or PAIMI Acts are a proper

3

A weightier objection, perhaps, is the relative novelty of this lawsuit. Respondents rightly observe that federal courts have not often encountered lawsuits brought by state agencies against other state officials. That does give us pause. Lack of historical precedent can indicate a constitutional infirmity, see, *e.g.*, *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. ____, ____ (2010) (slip op., at 25), and our sovereign-immunity decisions have traditionally warned against "'anomalous and unheard-of proceedings or suits,'" *Alden*, 527 U. S., at 727 (quoting *Hans*, 134 U. S., at 18).

Novelty, however, is often the consequence of past constitutional doubts, but we have no reason to believe that is the case here. In order to invoke the *Ex parte Young* exception to sovereign immunity, a state agency needs two things: first, a federal right that it possesses against its parent State; and second, authority to sue other state officials to enforce that right, free from any internal veto wielded by the state government. These conditions will rarely coincide—and at least the latter of them cannot exist without the consent of the State that created the agency and defined its powers. See *post*, at 3–4 (KENNEDY, J., concurring). We are unaware that the necessary conditions have ever presented themselves except in connection with the DD and PAIMI Acts, and the parties have referred us to no examples.[8] Thus, the ap-

—————

exercise of Congress's enumerated powers. As JUSTICE KENNEDY observes, whether the Acts run afoul of some *other* constitutional provision (*i.e.*, besides the Eleventh Amendment) "cannot be permitted to distort the antecedent question of jurisdiction." *Post*, at 5 (concurring opinion).

[8] We think greatly exaggerated the dissent's concern that, "[g]iven the number of state agencies across the country that enjoy independent litigating authority," today's decision "could potentially lead to all sorts of litigation in federal courts addressing internal state government

parent novelty of this sort of suit does not at all suggest its unconstitutionality. In any event, we are satisfied, for the reasons we have explained, that—novelty notwithstanding—the principles undergirding the *Ex parte Young* doctrine support its application to actions of this kind.

\*　　\*　　\*

Like the Court of Appeals, we are mindful of the central role autonomous States play in our federal system, and wary of approving new encroachments on their sovereignty. But we conclude no such encroachment is occasioned by straightforwardly applying *Ex parte Young* to allow this suit. It was Virginia law that created VOPA and gave it the power to sue state officials. In that circumstance, the Eleventh Amendment presents no obstacle to VOPA's ability to invoke federal jurisdiction on the same terms as any other litigant.

We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

---

disputes." *Post*, at 11. Such litigation cannot occur unless the state agency has been given a federal right of its own to vindicate (as VOPA alleges it has been given under the highly unusual statute at issue here).

# SUPREME COURT OF THE UNITED STATES

No. 09–529

VIRGINIA OFFICE FOR PROTECTION AND ADVO-
CACY, PETITIONER *v.* JAMES W. STEWART, III,
COMMISSIONER, VIRGINIA DEPARTMENT
OF BEHAVIORAL HEALTH AND DE-
VELOPMENTAL SERVICES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[April 19, 2011]

JUSTICE KENNEDY, with whom JUSTICE THOMAS joins,
concurring.

*Ex parte Young*, 209 U. S. 123 (1908), recognized a
narrow limitation on state sovereign immunity, permitting
railroad stockholders to enjoin enforcement of unconsti-
tutional rate regulations. That negative injunction was
nothing more than the pre-emptive assertion in equity of a
defense that would otherwise have been available in the
State's enforcement proceedings at law. *Id.*, at 165–166;
see also Harrison, Ex Parte *Young*, 60 Stan. L. Rev. 989,
997–999 (2008).

The Court has expanded the *Young* exception far beyond
its original office in order "to vindicate the federal interest
in assuring the supremacy of [federal] law," *Green* v.
*Mansour*, 474 U. S. 64, 68 (1985), but not without careful
attention in each case to the sovereign interests of the
State. See *Verizon Md. Inc.* v. *Public Serv. Comm'n of
Md.*, 535 U. S. 635, 649 (2002) (KENNEDY, J., concurring).
In *Edelman* v. *Jordan*, 415 U. S. 651 (1974), for example,
the Court applied the exception to an affirmative prospec-
tive order but not to equitable restitution, for the latter
was too similar to an award of damages against the State.

*Id.,* at 668; see *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 103 (1984) ("Under the theory of *Young*, such a suit [for restitution] would not be one against the State since the federal-law allegation would strip the state officer of his official authority. Nevertheless, retroactive relief was barred by the Eleventh Amendment"). And *Pennhurst* declined to extend *Young* to suits alleging a state-law violation, for without the need to ensure the supremacy of federal law there was no justification for restricting state sovereignty. 465 U. S., at 105–106.

The "straightforward inquiry" of *Verizon Md.* derives from *Edelman* and *Pennhurst*, both of which defined important limits on *Young* in order to respect state sovereignty while still adhering to principles necessary to implement the Supremacy Clause. As a result, *Verizon Md.* incorporates the very balancing it might at first seem to reject. *Verizon Md.* itself was an easy case, for it involved the same kind of preenforcement assertion of a defense that was at issue in *Young*. But when *Young*'s application is explored in novel contexts, as in *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S. 261 (1997), and also in this case, the inquiry "proves more complex," *Verizon Md., supra, at* 648 (KENNEDY, J., concurring).

In this case, in my view, the Virginia Office for Protection and Advocacy may rely on *Young*, despite the somewhat striking novelty of permitting a state agency to sue officials of the same State in federal court. In the posture of the case as it comes before the Court, it must be assumed that VOPA has a federal right to the records it seeks, and so the extension of *Young* would vindicate the Supremacy Clause. To be balanced against this important interest is the need to preserve "the dignity and respect afforded a State, which the immunity is designed to protect." *Coeur d'Alene, supra,* at 268. Permitting a state agency like VOPA to sue officials of the same State does

implicate the State's important sovereign interest in using its own courts to control the distribution of power among its own agents. But the affront to the State's dignity is diminished to some extent when it is noted that if the State had elected the alternate course of designating a private protection and advocacy system it then would have avoided any risk of internal conflict while still participating in the federal program. The availability of that alternate course does not, in my view, weigh much in favor of the validity of the underlying federal scheme, but the only question here is the reach of the *Young* exception.

Virginia's concern that the holding here upsets the federal balance is further mitigated by the various protections built into the structure of federal litigation to ensure that state officials do not too often call upon the federal courts to resolve their intramural disputes.

First, and most important, state law must authorize an agency or official to sue another arm of the State. If States do not wish to see their internal conflicts aired in federal court, they need not empower their officers or agencies to sue one another in a federal forum. And if state officers are not by state law empowered to sue, they may invoke federal jurisdiction only in their personal capacities.

Second, to the extent there is some doubt under state law as to an officer's or agency's power to sue, or any other state-law issue that may be dispositive, federal courts should abstain under *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496 (1941). *Pullman* recognizes the importance of state sovereignty by limiting federal judicial intervention in state affairs to cases where intervention is necessary. If an open question of state-law would resolve a dispute, then federal courts may wait for the resolution of the state-law issue before adjudicating the merits. Likewise, certification of questions of state law to the state courts may pretermit an otherwise sensitive federal con-

troversy. *Lehman Brothers* v. *Schein*, 416 U. S. 386, 391 (1974) (Certification "helps build a cooperative judicial federalism").

Finally, federal law does not often create rights for state officials or agencies to assert against other arms of the State. True, officials may assert that their personal federal rights are violated by unlawful state action, for example where the State engages in discriminatory employment practices. But the statutory framework in the case now before the Court is unusual in that it vests a state agency itself with federal rights against the State. Statutes tend to protect the rights of individuals, not officers or agencies, and the Constitution's rights-creating Clauses protect persons rather than officers. Because the *Young* exception is available only to those who assert federal violations, the paucity of federal rights vested in government officials makes the scope of the holding here a narrow one.

All this is simply to underscore that the program at issue may present constitutional questions but that the parties do not raise them in this litigation. Virginia does not argue, for example, that Congress exceeded its spending power under Article I, §8 by forcing a state that wishes to designate a public agency as its advocacy system to allow intramural suits like the instant one or by requiring that the agency be structured as Congress directs. *E.g.*, 42 U. S. C. §15043(a)(2)(G) (system must "be independent of any agency that provides treatment, services, or habilitation to individuals with developmental disabilities"); §15044(a)(2) ("[N]ot more than 1/3 of the members of the governing board may be appointed by the chief executive officer of the State"). *Young*—a court-made doctrine based on convenience, fiction, or both—neither implicates nor subsumes these more fundamental concerns regarding the excessive exercise of federal power. The Court should be most cautious before deciding cases that might later lead

to a general principle that the National Government can condition receipt of funds on the State's agreement to make far-reaching changes with respect to its governmental structure or its basic policies of governance in matters within its special competence. Assuming, as the Court must, that the statutes here are constitutional, the narrow question is whether VOPA may rely on *Young* to avoid the sovereign immunity bar.

One might doubt whether the constitutional question may be so severed from the *Young* analysis. The Court wields *Young* in the name of the Supremacy Clause only to vindicate important federal rights. Perhaps this Court should not extend the fiction in the name of claims that may rest on unconstitutional foundations. This concern is misplaced. The canon of constitutional avoidance directs courts to prefer the interpretation of a statute that preserves its validity, but the specter of a statute's unconstitutionality cannot be permitted to distort the antecedent question of jurisdiction. Courts interpret and evaluate a statute only after confirming their authority to adjudicate the case before them. To decline to adjudicate a federal right for fear of its potential unconstitutionality is in effect to invalidate the right in the quest to save it. The Court should not permit the commission of acts that violate a federal right on the mere suspicion that Congress acted beyond its authority. Because the suit must be assumed to vindicate the Supremacy Clause and poses no serious affront to state sovereignty in light of the options available to the State under the program, it may proceed.

With these observations, I join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

———————

No. 09–529

———————

## VIRGINIA OFFICE FOR PROTECTION AND ADVO-CACY, PETITIONER *v.* JAMES W. STEWART, III, COMMISSIONER, VIRGINIA DEPARTMENT OF BEHAVIORAL HEALTH AND DE-VELOPMENTAL SERVICES, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[April 19, 2011]

CHIEF JUSTICE ROBERTS, with whom JUSTICE ALITO joins, dissenting.

Today the Court holds that a state agency may sue officials acting on behalf of the State in federal court. This has never happened before. In order to reach this unsettling result, the Court extends the fiction of *Ex parte Young*—what we have called an "empty formalism"—well beyond the circumstances of that case. Because I cannot subscribe to such a substantial and novel expansion of what we have also called "a narrow exception" to a State's sovereign immunity, I respectfully dissent.

## I

### A

"The federal system established by our Constitution preserves the sovereign status of the States." *Alden* v. *Maine*, 527 U. S. 706, 714 (1999). As confirmed by the Eleventh Amendment, "[a]n integral component of that residuary and inviolable sovereignty" is the States' "immunity from private suits." *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 751–753 (2002) (internal quotation marks omitted); *Hans* v. *Louisi-*

*ana*, 134 U. S. 1, 13 (1890) ("'It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*'" (quoting The Federalist No. 81 (A. Hamilton))).  "The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *Federal Maritime Comm'n*, *supra*, at 760.  Accordingly, any time a State is haled into federal court against its will, "the dignity and respect afforded [that] State, which [sovereign] immunity is designed to protect, are placed in jeopardy." *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S. 261, 268 (1997).  The immunity does not turn on whether relief will be awarded; "[t]he Eleventh Amendment is concerned not only with the States' ability to withstand suit, but with their privilege not to be sued." *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139, 147, n. 5 (1993).  See *Federal Maritime Comm'n*, *supra*, at 769 ("the primary function of sovereign immunity is not to protect state treasuries, but to afford the States the dignity and respect due sovereign entities" (citation omitted)).

Because of the key role state sovereign immunity plays in our federal system, the Court has recognized only a few exceptions to that immunity.  The sole one relevant here is the "narrow exception," *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 76 (1996), established by our decision in *Ex parte Young*, 209 U. S. 123 (1908).  In *Ex parte Young*, the Court held that private litigants could seek an injunction in federal court against a state official, prohibiting him from enforcing a state law claimed to violate the Federal Constitution.  See *id.*, at 159–168.  As we have often observed, *Ex parte Young* rests on the "obvious fiction," *Coeur d'Alene Tribe*, *supra*, at 270, that such a suit is not really against the State, but rather against an individual who has been "stripped of his official or representative character" because of his unlawful conduct, *Ex parte*

*Young*, *supra*, at 159–160.[1]

While we have consistently acknowledged the important role *Ex parte Young* plays in "promot[ing] the vindication of federal rights," we have been cautious not to give that decision "an expansive interpretation." *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 105, 102 (1984). Indeed, the history of our *Ex parte Young* jurisprudence has largely been focused on ensuring that this narrow exception is "narrowly construed," 465 U. S., at 114, n. 25. We have, for example, held that the fiction of *Ex parte Young* does not extend to suits where the plaintiff seeks retroactive relief, *Edelman* v. *Jordan*, 415 U. S. 651, 678 (1974); where the claimed violations are based on state law, *Pennhurst*, *supra*, at 106; where the federal law violation is no longer "ongoing," *Green* v. *Mansour*, 474 U. S. 64, 71 (1985); "where Congress has prescribed a detailed remedial scheme for the enforcement against a State" of the claimed federal right, *Seminole Tribe*, *supra*, at 74; and where "special sovereignty interests" are implicated, *Coeur d'Alene Tribe*, *supra*, at 281.

We recently stated that when "determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535 U. S. 635, 645 (2002) (internal quotation marks omitted). But not every plaintiff who complies with these prerequisites will be able to bring suit under *Ex parte Young*. Indeed, in *Verizon* itself the Court went beyond its so-called straightforward inquiry in con-

—————

[1] *Ex parte Young* also rests on the "well-recognized irony that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment." *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 105 (1984) (internal quotation marks omitted).

sidering whether *Ex parte Young* applied. After deciding the plaintiffs "clearly satisfie[d]" the "straightforward inquiry," the Court went on to examine whether Congress had created a detailed remedial scheme like the one in *Seminole Tribe.* 535 U. S., at 645, 647–648 (internal quotation marks omitted). Only after determining that Congress had not done so did the Court conclude that the suit could go forward under *Ex parte Young*.

If *Verizon*'s formulation set forth the only requirements for bringing an action under *Ex parte Young*, two of our recent precedents were wrongly decided. In *Seminole Tribe*, the Court acknowledged that it had often "found federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to end a continuing violation of federal law." 517 U. S., at 73 (internal quotation marks omitted). The Court held, however, that the "situation presented" there was "sufficiently different from that giving rise to the traditional *Ex parte Young* action so as to preclude the availability of that doctrine." *Ibid.*[2]

In *Coeur d'Alene Tribe*, the Court recognized that an "allegation of an ongoing violation of federal law where the requested relief is prospective is *ordinarily* sufficient to invoke the *Young* fiction." 521 U. S., at 281 (emphasis added). The Court held, however, that the action could not proceed under *Ex parte Young* because it implicated "special sovereignty interests"—in that case, the State's

—————

[2] While I agree that in *Seminole Tribe* "we refused to permit suit to proceed" under *Ex parte Young* because Congress "had foreclosed recourse to the doctrine," *ante*, at 7, n. 3, that simply confirms my point that the availability of *Young* depends on more than just whether *Verizon*'s prescribed inquiry is satisfied. In short, *Seminole Tribe* makes clear that a plaintiff who files a "complaint alleg[ing] an ongoing violation of federal law and seeks relief properly characterized as prospective," *Verizon*, 535 U. S., at 645 (internal quotation marks omitted), may nonetheless be barred from pursuing an action under *Young*.

property rights in certain submerged lands. 521 U. S., at 281–283.

As we explained in *Papasan* v. *Allain*, 478 U. S. 265 (1986), there are "certain types of cases that formally meet the *Young* requirements of a state official acting inconsistently with federal law but that stretch that case too far and would upset the balance of federal and state interests that it embodies." *Id.*, at 277. This is one of those cases.

In refusing to extend *Ex parte Young* to claims that involve "special sovereignty interests," the Court in *Coeur d'Alene Tribe* warned against a rote application of the *Ex parte Young* fiction:

> "To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle . . . that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction. The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading. Application of the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction." 521 U. S., at 270.

## B

It is undisputed that petitioner's complaint alleges an ongoing violation of federal law by a state official and seeks only prospective relief. If this were a "traditional *Ex parte Young* action," *Seminole Tribe*, *supra*, at 73, petitioner might very well be able to pursue its claims under that case. This, however, is anything but a traditional case—and petitioner is anything but a typical *Ex parte Young* plaintiff.

Unlike the plaintiffs in *Ex parte Young*—and, for that matter, unlike any other plaintiff that has ever sought to invoke *Ex parte Young* before this Court—petitioner is a state agency seeking to sue officials of the same State in federal court. The Court is troubled by this novelty, *ante* at 12–13, but not enough. See *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. ___, ___ (2010) (slip op., at 25) ("Perhaps the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent" (internal quotation marks omitted)); cf. *Alden*, 527 U. S., at 743–745; *Printz* v. *United States*, 521 U. S. 898, 905–910, 918, 925 (1997). This is especially true in light of the "presumption" we articulated more than 120 years ago in *Hans* v. *Louisiana*, that States are immune from suits that would have been "anomalous and unheard of when the Constitution was adopted." *Hans*, 134 U. S., at 18; see also *Alden*, *supra*, at 727 (invoking presumption).

Accordingly, when determining whether to lift the bar of sovereign immunity, we have "attribute[d] great significance" to the absence of analogous suits "at the time of the founding or for many years thereafter." *Federal Maritime Comm'n*, 535 U. S., at 755. This sort of suit was not only anomalous and unheard of at the time of the founding; it was anomalous and unheard of yesterday. The *Hans* presumption applies here with full force.

The Court speculates that these suits have not previously arisen because the necessary conditions—state agencies pursuing a federal right free of internal state veto—are themselves novel. See *ante*, at 12; see also *ante*, at 3–4 (KENNEDY, J., concurring). Even if true, that simply highlights the fact that this case is not suitable for mere rote application of *Ex parte Young*.

In addition to its novel character, petitioner's complaint "conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Pennhurst*, 465 U. S.,

at 106. In *Alden*, we held that state sovereign immunity prohibited Congress from authorizing "private suits against nonconsenting States in their own courts." 527 U. S., at 749. We explained that such power would permit one branch of state government, the "State's own courts," "to coerce the other branches of the State" and "to turn the State against itself." *Ibid.*

Here the Court goes further: this suit features a state agency on one side, and state executive officials on the other. The objection in *Alden* was that the Federal Government could force the State to defend itself before itself. Here extending *Young* forces the State to defend itself *against* itself in federal court.

Both sides in this case exercise the sovereign power of the Commonwealth of Virginia. Petitioner claims the title of "The Commonwealth of Virginia" in its complaint, App. 10; respondents are state officials acting in an official capacity. Whatever the decision in the litigation, one thing is clear: The Commonwealth will win. And the Commonwealth will lose. Because of today's holding, a federal judge will resolve which part of the Commonwealth will prevail.

Virginia has not consented to such a suit in federal court; rather, petitioner has unilaterally determined that this intramural dispute should be resolved in that forum. This is precisely what sovereign immunity is supposed to guard against. See *ante*, at 10 ("The specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent"). That indignity is compounded when the State is haled into federal court so that a federal judge can decide an internal state dispute.

The Court is wrong to suggest that Virginia has no sovereign interest in determining *where* such disputes will be resolved. See *ante*, at 10–11, and n. 6. It is one thing for a State to decide that its components may sue one

another in its own courts (as Virginia did here); it is quite another thing for such a dispute to be resolved in federal court against the State's wishes. For this reason, the Court's examples of other suits pitting state entities against one another are inapposite. In each of those hypotheticals, the State consented to having a particular forum resolve its internal conflict. That is not true here.[3]

In sum, the "special sovereignty interests" implicated here make this case "sufficiently different from that giving rise to the traditional *Ex parte Young* action so as to preclude the availability of that doctrine." *Seminole Tribe*, 517 U. S., at 73. I would cling to reality and not extend the fiction of *Ex parte Young* to cover petitioner's suit.

## II

The Court offers several justifications for its expansion of *Ex parte Young*. None is persuasive.

The Court first contends that whether the *Ex parte Young* fiction should be applied turns only on the "relief sought" in a case. *Ante*, at 8–9 (internal quotation marks omitted). The Court is correct that several of our prior cases have focused on the nature of the relief requested. See, *e.g.*, *Edelman*, 415 U. S., at 664–671. That may well be because "the difference between the type of relief barred by the Eleventh Amendment and that permitted

––––––––––

[3] Sovereign immunity principles would of course not prohibit this Court from reviewing the federal questions presented by this suit if it had been filed in state court. See *ante*, at 11. We have held that "it is inherent in the constitutional plan that when a state court takes cognizance of a case, the State assents to appellate review by this Court of the federal issues raised in the case whoever may be the parties to the original suit, whether private persons, or the state itself." *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation*, 496 U. S. 18, 30 (1990) (internal quotation marks and citation omitted). By contrast, there is nothing "inherent in the constitutional plan" that warrants lower federal courts handling intrastate disputes absent a State's consent.

under *Ex parte Young* will not in many instances be that between day and night." *Id.*, at 667. But the Court is wrong to draw a negative implication from those cases and categorically conclude that there can be no other basis for determining whether to extend *Ex parte Young*'s fiction.

The thrust of the Court's argument appears to be that, because the relief sought here is no different from that which could be sought in a suit by a private protection and advocacy system, the doctrine of *Ex parte Young* should also apply to a suit brought by a state system. *Ante*, at 7–9. But private entities are different from public ones: They are private. When private litigants are involved, the State is not turned against itself.

Contrary to the Court's suggestion, see *ante*, at 9, there is indeed a real difference between a suit against the State brought by a private party and one brought by a state agency. It is the difference between eating and cannibalism; between murder and patricide. While the ultimate results may be the same—a full stomach and a dead body—it is the means of getting there that attracts notice. I would think it more an affront to someone's dignity to be sued by a brother than to be sued by a stranger. While neither may be welcomed, that does not mean they would be equally received.

The Court also contends that petitioner's ability to sue state officials in federal court "is a consequence of Virginia's own decision to establish a public [protection and advocacy] system." *Ibid.* This cannot mean that Virginia has consented to an infringement on its sovereignty. That argument was rejected below, and petitioner did not seek certiorari on that issue. See *Virginia* v. *Reinhard*, 565 F. 3d 110, 116–118 (CA4 2009); Pet. for Cert. i.

Instead the Court claims that "Virginia has only itself to blame"—if it wanted to avoid its current predicament, it could have chosen to establish a private entity instead. *Ante*, at 9–10, and n. 5; see also *ante*, at 3 (KENNEDY, J.,

concurring). But I am aware of no doctrine to the effect that an unconstitutional establishment is insulated from challenge simply because a constitutional alternative is available. And here the public and private systems are not interchangeable alternatives in any event.

The Court's analysis is also circular; it wrongly assumes Virginia knew in advance the answer to the question presented in this case. Only *after* concluding that *Ex parte Young* applies to this arrangement—that for the first time in history a state agency may sue an unwilling State in federal court—can the Court suggest that Virginia knowingly exposed its officers to suit in federal court.

In a similar vein, the Court asserts that because Virginia law authorizes petitioner to exercise independent litigating authority, petitioner should be treated the same "as any other litigant." *Ante*, at 13. But petitioner is not like any other litigant. While it is true petitioner enjoys some independence from the State's executive branch, that does not mean petitioner is independent *from the State.* As noted, petitioner certainly views itself as "The Commonwealth of Virginia," App. 10, and would presumably invoke sovereign immunity itself if sued. As a matter of sovereign immunity law, it should make no difference how a State chooses to allocate its governmental powers among different state agencies or officials.

The Court is wrong to suggest that simply because petitioner possesses independent litigating authority, it may sue state officials in federal court. See *ante*, at 13 ("the Eleventh Amendment presents no obstacle" since it "was Virginia law that created [petitioner] and gave it the power to sue state officials"). There is more to this case than merely whether petitioner needs the approval of the Attorney General to sue, and the Virginia Code provisions cited by the Court say nothing about actions against the State in federal court.

If independent litigating authority is all that it takes,

then scores of state entities now "suddenly possess the authority to pursue *Ex parte Young* actions against other state officials" in federal court. *Reinhard, supra,* at 124. There would be no Eleventh Amendment impediment to such suits. Given the number of state agencies across the country that enjoy independent litigating authority, see, *e.g.,* Brief for State of Indiana et al. as *Amici Curiae* 11– 13, the Court's decision today could potentially lead to all sorts of litigation in federal courts addressing internal state government disputes.

And there is also no reason to think that the Court's holding is limited to state *agency* plaintiffs. According to the Court's basic rationale, state officials who enjoy some level of independence could as a matter of federal law bring suit against other state officials in federal court. Disputes that were formerly resolved in state cabinet rooms may now appear on the dockets of federal courts.

\*    \*    \*

No one questions the continued vitality or importance of the doctrine announced in *Ex parte Young.* But *Ex parte Young* was about affording relief to a private party against unconstitutional state action. It was not about resolving a dispute between two different state actors. That is a matter for the State to sort out, not a federal judge.

Our decision in *Chisholm* v. *Georgia,* 2 Dall. 419 (1793)—permitting States to be sued by private parties in federal court—"created such a shock of surprise" throughout the country "that the Eleventh Amendment was at once proposed and adopted." *Principality of Monaco* v. *Mississippi,* 292 U. S. 313, 325 (1934). It is fair to say that today's decision will probably not trigger a similar response. But however much their practical functions and prominence may have changed in the past 218 years, the States remain a vital element of our political structure. Sovereign immunity ensures that States retain a stature

commensurate with their role under the Constitution. Allowing one part of the State to sue another in federal court, so that a federal judge decides an important dispute between state officials, undermines state sovereignty in an unprecedented and direct way.  The fiction of *Ex parte Young* should not be extended to permit so real an intrusion.

Because I believe the Court's novel expansion of *Ex parte Young* is inconsistent with the federal system established by our Constitution, I respectfully dissent.