In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1351

MICHAEL AMUNDSON, by his guardians Ella and
Richard Amundson, *et al.*,

*Plaintiffs-Appellants*,

*v.*

WISCONSIN DEPARTMENT OF HEALTH SERVICES, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 12-cv-609-bbc—**Barbara B. Crabb**, *Judge*.

ARGUED JUNE 5, 2013—DECIDED JULY 10, 2013

Before EASTERBROOK, *Chief Judge*, and BAUER and
HAMILTON, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. In 2011 the State of
Wisconsin decided to save money by reducing the sub-
sidies for the Wisconsin Care Program, which among
other things funds disabled persons who live in group
homes. (Wisconsin makes block grants to organiza-
tions such as Community Health Partnership, Inc.,

which administer the programs. Although these inter-
mediaries are responsible for many choices about how to
allocate available funds, we simplify this opinion by
assuming that the state itself made all of the decisions.) The
cuts, which took effect in January 2012, fell most heavily
on groups whose care is most costly. The plaintiffs in
this suit are developmentally disabled and bore the
largest cuts. Persons who had been receiving smaller
payments bore smaller cuts; and for some (such as those
classified by one intermediary as frail elderly) per capita
payments increased. Plaintiffs contend that making larger
absolute cuts for persons whose care is most expensive
violates both the Rehabilitation Act and the Americans
with Disabilities Act. They also contend that reduction
in the state's payments increases the risk that they will
be moved from group homes to institutions, which
they say would violate both statutes.

Plaintiffs asked the district court to issue an injunc-
tion that would require Wisconsin to restore the pay-
ment schedule that was in force until 2012. A request for
money from the state naturally led to questions about
the scope of state sovereign immunity under the
eleventh amendment. The district judge did not see
any problem with the claim based on the Rehabilitation
Act, for states have waived their immunity as a condi-
tion of receiving federal funds. See *Stanley v. Litscher*,
213 F.3d 340, 344 (7th Cir. 2000). But the ADA does
not require states to give up their immunity in trade for
grants. The Supreme Court has held that the portions of
the ADA that are not designed to implement disabled
persons' constitutional rights are not based on §5 of the

fourteenth amendment and thus cannot be used to over-ride states' sovereign immunity. Compare *University of Alabama v. Garrett*, 531 U.S. 356 (2001), with *Tennessee v. Lane*, 541 U.S. 509 (2004). The district court concluded that the provisions of the ADA that plaintiffs invoke do not concern the Constitution and therefore are not §5 legislation. That left the possibility of prospective relief against state officials under *Ex parte Young*, 209 U.S. 123 (1908). But the district court held that an order to pay money is never proper under *Ex parte Young* and that the ADA therefore drops out of the case.

We doubt that this issue matters. Throughout its opinion, the district court stressed that the Rehabilita-tion Act and the ADA are substantively identical with respect to plaintiffs' claims. See *Jaros v. Illinois Department of Corrections*, 684 F.3d 667, 671–72 (7th Cir. 2012). None of the litigants argues otherwise in this court. This means that the Rehabilitation Act by itself affords plain-tiffs any relief to which they may be entitled; claims under the ADA become academic. At all events, we record our disagreement with the district court's conclu-sion about the propriety of relief under *Ex parte Young*. Although "*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury," *Virginia Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632, 1639 (2011); see also *Edelman v. Jordan*, 415 U.S. 651 (1974), other forms of relief are possi-ble.

For example, an injunction might require the state to treat developmentally disabled persons no worse than

persons with other disabilities—for example, by making the same reductions across the board. That is not what plaintiffs seek (they would prefer to have their 2011 benefits restored), but it would eliminate discrimination. Or a district judge might spell out the minimum housing required by federal law and leave it to Wisconsin to determine how to fulfil its obligations. That compliance with an injunction requiring performance, rather than payment, may turn out to be costly has never been an objection to the command to implement federal law. See, e.g., *Ameritech Corp. v. McCann*, 297 F.3d 582, 587 (7th Cir. 2002). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002).

To the plaintiffs' claims. We start with their contention that the rates now in force are too low to allow them to continue living in group homes with non-disabled persons. If they must move to institutions housing only the disabled, plaintiffs contend, that would violate 42 U.S.C. §12132 and implementing regulations, which are commonly understood to limit states' ability to remove disabled persons from settings generally accessible by the public. We say "limit" rather than "prohibit" because although *Olmstead v. L.C.*, 527 U.S. 581 (1999), held that institutionalization can be a form of "discrimination" prohibited by §12132, it added that a state may be able

to justify institutional treatment if "the resources available to the State" are limited. 527 U.S. at 587. That's the sort of justification Wisconsin invokes.

The district court did not reach the merits of plaintiffs' claim, however, because it deemed the suit premature. None of the plaintiffs has been placed in an institution. Indeed, plaintiffs do not allege that *any* developmentally disabled person in Wisconsin has been moved, involuntarily, from group to institutional care. Plaintiffs do allege that some of their number have been required to leave group settings where they would have preferred to remain, but they do not allege inability to find another group home willing to accept the level of reimbursement that the Wisconsin Care Program now offers. Wisconsin believes that the changes it has made will reduce the cost of care by excluding the highest-cost providers from the program, but without landing any developmentally disabled person in an institution. If that's so, Wisconsin has fulfilled its obligations under federal law, no matter how much plaintiffs prefer the comfort and amenities of the more-expensive group homes. And *whether* that is so, the district court concluded, cannot be determined without more experience under the current rates. Plaintiffs fear the worst, but their fears may be unwarranted.

We agree with the district court that this aspect of the suit is unripe. Ripeness is a matter of timing: the judiciary should not act prematurely or unnecessarily. If plaintiffs' fears come to pass, they can return to court. If the fears do not come to pass, however, there is no

legal injury, and an opinion today would be advisory. Wisconsin maintains that it has safeguards in place that will prevent any plaintiff from being transferred to an institution. The complaint does not give a sufficient reason to think that these will fail.

By contrast, plaintiffs' contention that they are being treated worse than persons with other disabilities is ripe. If Wisconsin buys the best available care for persons with visual impairments, but pays only for mediocre care for the developmentally disabled, then plaintiffs have a theory of discrimination even though all of them remain in group homes. The district court stopped here, however, concluding in reliance on *Grzan v. Charter Hospital*, 104 F.3d 116 (7th Cir. 1997), that discrimination among disabled persons never violates the ADA or the Rehabilitation Act. See also, e.g., *Mallett v. Wisconsin Division of Vocational Rehabilitation*, 130 F.3d 1245 (7th Cir. 1997); *EEOC v. CNA Insurance Cos.*, 96 F.3d 1039, 1044 (7th Cir. 1996). *Grzan* held that a disabled person can show forbidden discrimination only by comparison with a non-disabled person. Plaintiffs concede that *Grzan* dooms this aspect of their suit but ask us to modify or overrule *Grzan* in light of the Supreme Court's later decision in *Olmstead*. They observe that after *Olmstead* several appellate courts have concluded that discrimination among persons with different disabilities can state a good claim. See, e.g., *Henrietta D. v. Bloomberg*, 331 F.3d 261, 274 (2d Cir. 2003); *C.O. v. Portland Public Schools*, 679 F.3d 1162, 1169 (9th Cir. 2012); *Johnson v. K Mart Corp.*, 273 F.3d 1035, 1053–54 (11th Cir. 2001).

*Olmstead* indeed supersedes *Grzan*, for two reasons. First, the Justices observed that they have allowed intraclass claims of discrimination. *Olmstead* gives as an example *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996), which concluded that discrimination against older persons within the class of all persons protected by the Age Discrimination in Employment Act—say, favoring 45 year olds over 60 year olds—could violate that statute. *Olmstead*, 527 U.S. at 598 n.10. Second, and more important, the Court held that the word "discrimination" as used in §12132 includes not only disparate treatment of comparably situated persons but also undue institutionalization of disabled persons, *no matter how anyone else is treated*. 527 U.S. at 597–603. *Grzan* thought that "discrimination" requires a comparison to the treatment of someone outside the protected class; *Olmstead* holds otherwise.

This is as far as plaintiffs get, however, because they have not offered any comparison group or any standard by which "worse treatment" could be identified. Before the change made in 2011, developmentally disabled persons received greater subsidies than any other subcategory of the disabled. The 2011 revisions cut their subsidy, but plaintiffs do not contend that they are now treated *worse* than some other set of disabled persons.

Suppose it costs at least $50,000 a year to provide for care of a developmentally disabled person in a group home and more (say, $75,000) to pay for top-quality group care. Suppose that it costs only $40,000 a year to provide for care of a blind person in a group home. Finally,

suppose that until 2011 Wisconsin was paying $75,000 a year for each developmentally disabled person and $40,000 a year for each blind person, but that in 2011 the payments were cut to $50,000 and $40,000 for these groups. Although one group lost money and the other did not, this would not be discrimination *against* the developmentally disabled; it would instead be the end of discrimination *in favor of* the developmentally disabled.

If care for dyslexia costs only $5,000 a year for several years, then nothing after training is completed, it would amount to "discrimination" to provide greater payments for dyslexics than for the developmentally disabled. But plaintiffs do not say that the amount provided for their care is below what Wisconsin provides for some other disability that is less expensive to cope with. They do not even say that they are receiving a lower percentage of the cost of their care than persons with other kinds of disabilities do.

Instead, plaintiffs' theory is that *any* reduction that leaves them unable to remain in group homes that their physicians or other providers think the optimal placement for them is forbidden "discrimination." That is untenable, unless the state is providing other groups of disabled persons with whatever care, in whatever location, their physicians most favor, and plaintiffs do not contend this. Plaintiffs tell us *nothing* about what kind of care persons with other disabilities receive in Wisconsin. Their sole argument is that Wisconsin reduced their own subsidies. Apart from the possibility (which is unripe) that the reduction may lead

to undue institutionalization, this is not a theory of "discrimination" at all. It is a claim of absolute entitlement. Perhaps such a claim could be made under the Medicaid Act (a principal source of funds for the Wisconsin Care Program), but plaintiffs told the district court, and repeated at oral argument on appeal, that they are not contending that Wisconsin has violated the duties it assumed when joining the Medicaid program.

In sum, plaintiffs' contention that Wisconsin's decision will lead to their institutionalization is unripe, and their contention that Wisconsin has discriminated in some other way founders for lack of a useful theory of "discrimination." The judgment of the district court accordingly is affirmed.