In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 15-2377

KARLA STEIMEL,

*Plaintiff-Appellant,*

and

THOMAS MAERTZ, *et al.,*

*Intervening Plaintiffs-Appellants,*

*v.*

JOHN J. WERNERT, Secretary of the Indiana Family and Social
Services Administration, *et al.,*

*Defendants-Appellees.*

———————————

No. 15-2389

MICHAEL BECKEM AND LOIS BECKEM,

*Plaintiffs-Appellants,*

*v.*

INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, and
JOHN J. WERNERT, Secretary of the Indiana Family and Social
Services Administration,

*Defendants-Appellees.*

———————————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
Nos. 13-cv-00957, 14-cv-00668 — **Jane E. Magnus-Stinson**, *Judge*.

————————

ARGUED JANUARY 5, 2016 — DECIDED MAY 10, 2016

————————

Before WOOD, *Chief Judge*, and KANNE and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. No one would accuse the Medicaid program of simplicity. Our task in this appeal is to consider whether Indiana has chosen an acceptable way to deliver certain home- and community-based services. It does so through so-called waiver programs that are operated by state Medicaid agencies. The word "waiver" is used because the default assumption under Medicaid is that these kinds of services will be delivered in institutions. Congress has recognized, however, that many people are better served by and prefer community-based care. For these people, it uses waiver programs under which the state (and the federal government) will pick up the tab.

The Indiana Family and Social Services Administration (the Agency) runs three waiver programs relevant to this case: the Aged and Disabled Medicaid Waiver Program (A&D waiver), the Community Integration and Habilitation Medicaid Waiver Program (CIH waiver), and the Family Supports Medicaid Waiver Program (FS waiver). Importantly for our case, the programs vary in how much money each client can receive, what must be demonstrated to qualify for aid, and who is entitled to assistance. Because Indiana has closed most of its institutional facilities, these waiver programs serve the

vast majority of people with disabilities in Indiana. The state's total institutional capacity can accommodate only one quarter of the number of people on the CIH waiver alone.

Until 2011, the Agency placed many people with developmental disabilities on the A&D waiver, which has no cap on services. That changed when the Agency decided that it had not been adhering to certain A&D rules. In order to fix its mistakes, it enacted a policy change that rendered many developmentally disabled persons, including the plaintiffs, ineligible for care under the A&D waiver. These people were moved to the FS waiver, under which they may receive services worth no more than $16,545 annually. Developmentally disabled people who were switched from the A&D waiver to the FS waiver may apply for the CIH waiver, which is uncapped. But not everyone qualifies for the CIH waiver, and so this possibility is an empty one for many.

The plaintiffs in the two cases we have consolidated for disposition are developmentally disabled persons who were moved from the A&D waiver to the FS waiver. They argue that their new assignment violates the integration mandate of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, because it deprives them of community interaction and puts them at risk of institutionalization. They also seek class certification.

The district court granted summary judgment to the defendants on the integration-mandate claims and denied class certification. We conclude that there is a genuine dispute of material fact with respect to the individual claims based on the integration mandate, and so judgment for the defendants to that extent was premature. The district court did not abuse

its discretion, however, in declining to certify the class, because the proposed class is too vague.

## I

### A

In 1981, Congress enacted Section 1915(c) of the Social Security Act (SSA), 42 U.S.C. § 1396n, which established the Home and Community-Based Care Waiver Program. See Andrew I. Batavia, *A Right to Personal Assistance Services: "Most Integrated Setting Appropriate" Requirements and the Independent Living Model of Long-Term Care*, 27 AM. J.L. & MED. 17, 24 (2001). The program allowed states to diverge from the traditional Medicaid structure by providing community-based services to people who would, under the traditional Medicaid structure, require institutionalization. Its purpose was to "provid[e] real choices and opportunities to control their lives for individuals who wish to live in the community" and allow deviation from Medicaid's traditional "institutional bias." *Id.*

Participating states have significant discretion in how they craft their waiver programs. Nonetheless, the programs must conform to several restrictions: the average annual cost of a state's waiver programs cannot exceed that of institutional services, *id.*; states must inform eligible persons of their options and allow those qualified to take advantage of waiver slots up to the number available, *id.*; and states must comply with the ADA's integration mandate, which dictates that states "shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d) (1998).

### B

States submit detailed applications for each waiver program to the Centers for Medicare and Medicaid Services (CMS). CMS approves waiver programs for an initial term of three years, after which it may re-approve them for five-year periods. The A&D waiver, the FS waiver, and the CIH waiver all fall under SSA § 1915(c), 42 U.S.C. § 1396n(c), and have been approved by CMS. (That approval is not at issue here.) The Agency oversees all of Indiana's waiver programs, through different subdivisions for each one.

Under Indiana law, the A&D waiver is meant "to provide home- and community-based services to individuals who, but for the provision of such services, would require nursing facility level of care." The FS waiver provides "waiver services to participants of any age residing in a range of community settings as an alternative to care in an intermediate care facility for individuals with intellectual disabilities … or related conditions." The CIH waiver provides services to a similar population that meets additional criteria. While the FS waiver caps services at $16,545 per year, there is no cap on services under the A&D or CIH waivers. Different services are available under each waiver, and the rules for reimbursement vary by program.

Waiver participants may also use services provided through the state's traditional Medicaid plan. These include "prior-authorization services," which are services that the state has pre-approved as medically necessary. 405 IND. ADMIN. CODE § 5-3-13. There is one type of prior-authorization service relevant to this case: "home health services." *Id.* § 5-3-13(a)(9). Home-health services include "[s]killed nursing," "[h]ome health aid services," "[p]hysical and occupa-

tional therapies," "[s]peech pathology services," "[r]enal dialysis," and "[t]elehealth services." *Id.* § 1-4.2-3(a). Homehealth services, as the name suggests, "must be performed in the home." *Id.* § 1-4.2-3. If a service is available under both the relevant waiver and the state Medicaid programs, participants must generally use prior-authorization services before tapping into their waiver funds.

The Agency assigns a case manager to each waiver participant. The case manager works with the participant and his or her guardian to determine the appropriate services for that participant. Certain services are available under some waivers but not under others. After the case manager, participant, and guardian create an individualized plan, the case manager submits it for approval to the appropriate Agency subdivision.

C

In 2006, the state opened the A&D waiver to persons with developmental disabilities, so long as they had either "skilled medical need" or substantial functional limitations. In 2011, it reversed this policy, and thereafter allowed only people who could demonstrate both a skilled medical need *and* substantial functional limitations to participate in the A&D waiver. As space became available on the FS waiver, the state moved A&D waiver participants to the FS waiver.

The plaintiffs are developmentally disabled people who rely on Indiana's home- and community-based Medicaid waiver programs. Karla Steimel suffers from cerebral palsy, while Thomas Maertz has been diagnosed with both cerebral palsy and mental retardation. Colton and Cody Cole are twin

brothers; they both suffer from cerebral palsy. Timothy Keister has been diagnosed with mental retardation. Michael and Lois Beckem are siblings; Michael has been diagnosed with mild mental retardation, and Lois has Down's syndrome.

Before 2013, the plaintiffs were served under Indiana's A&D waiver. Under the A&D waiver, they were able to enjoy community activities such as eating in restaurants, visiting flea markets, and window-shopping. Michael and Lois Beckem attended day services, which allowed them to go into the community and interact with people without disabilities. While all of the plaintiffs suffer from severe conditions, none of them needs the skilled medical services necessary to meet the prerequisites of the A&D waiver, as it has been structured since 2011. All were shifted to the FS waiver in 2013. Later, Karla Steimel and Timothy Keister were moved to the CIH waiver; they concede that their claims are moot. While Lois Beckem has since been moved back to the A&D waiver, she asserts a damages claim. The Coles, Maertz, and Michael Beckem remain on the FS waiver.

The plaintiffs still before us allege that their forced move to the FS waiver has dramatically curtailed their ability to participate in community activities. According to their guardians' affidavits, the plaintiffs were able to enjoy roughly 40 hours in the community each week under the A&D waiver. Since their transition to the FS waiver, their community time has shrunk to 10 to 12 hours per week. This roughly 30-hour-per-week reduction is a result of the FS waiver cap, under which they are allowed to use only $16,545 in waiver services. (That amount of money works out, plaintiffs say, to roughly 12 hours per week in services that can be used outside the home.) Although the plaintiffs are also eligible for Medicaid

prior-authorization services, those services may not be used outside the home and so are not relevant to these claims.

The plaintiffs' guardians also aver that despite the availability of prior-authorization services, restrictions on those services have led to lapses in supervision that have either led to injury or serious risk of injury to the plaintiffs. The plaintiffs contend that, given the limitations on prior-authorization services and the monetary cap on the FS waiver, these gaps in supervision are unavoidable and have put them at serious risk of institutionalization. Tamara Awald, the mother of Colton and Cody Cole, also indicates that she has had to pay out-of-pocket for care when she travels for work.

Karla Steimel filed her initial class-action complaint and motion for class certification on June 14, 2013. Before the court ruled on that motion, Maertz, the Coles, and Keister moved for leave to intervene as named plaintiffs. The district court granted the intervention motion, but on March 24, 2014 it denied class certification. The Beckems commenced their separate case on April 30, 2014.

The parties in both cases filed cross-motions for summary judgment. The state argued that it should prevail because the plaintiffs' claims did not even implicate the integration mandate, while the plaintiffs contended that they were entitled to judgment because they had shown beyond dispute that the state was violating the integration mandate. The district court agreed with the state and granted it summary judgment in both cases on June 9, 2015. This appeal followed.

## II

Congress intended the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 (1999) (quoting 42 U.S.C. § 12101(b)(1)). Section 12132 decrees that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." A "public entity" includes "any State or local government" or "any department [or] agency … of a State … or local government." *Id.* §§ 12131(1)(A), (B). A "qualified individual with a disability" is someone who, "with or without reasonable modifications to rules, policies, or practices … meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2).

The ADA directs the Attorney General to "promulgate regulations … that implement" the provisions of Title II, including § 12132. *Id.* § 12134(a). In response to this command, the Attorney General implemented the regulation known as the "integration mandate." The integration mandate states that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (1998). The regulations' preamble defines "the most integrated setting appropriate to the needs of qualified individuals with disabilities" as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B. Public entities are required to "make reasonable modifications" to

avoid "discrimination on the basis of disability" except if do-
ing so would "fundamentally alter" the nature of the pro-
grams. 28 C.F.R. § 35.130(b)(7).

Because the relevant provisions of the Rehabilitation Act
and its regulations are "materially identical" to their ADA
counterparts, *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324
F.3d 906, 912 (7th Cir. 2003), courts "construe and apply them
in a consistent manner." *Radaszewski ex rel. Radaszewski v.
Maram*, 383 F.3d 599, 607 (7th Cir. 2004). The state does not
challenge the validity of any of the regulatory provisions at
issue.

We address the parties' arguments in two stages: first, we
consider whether the plaintiffs' claims fall within the scope of
the integration mandate; and second, we ask whether the
state's policy violated the mandate. The plaintiffs offer two
theories for our consideration: (1) that the state's policies have
impermissibly rendered the plaintiffs institutionalized in
their own homes, and (2) that the state's policies have put
them at serious risk of institutionalization.

We review *de novo* the district court's decision to grant
summary judgment. *Advance Cable Co., LLC v. Cincinnati Ins.
Co.*, 788 F.3d 743, 746 (7th Cir. 2015). When reviewing cross-
motions for summary judgment, we "take the motions one at
a time and then, as usual, construe all facts and draw all rea-
sonable inferences in favor of the non-moving party." *Id.* Sum-
mary judgment is appropriate only "if the movant shows that
there is no genuine dispute as to any material fact and the mo-
vant is entitled to judgment as a matter of law." FED. R. CIV. P.
56(a).

A

In enacting the ADA, Congress prohibited outright discrimination and "identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'" *Olmstead*, 527 U.S. at 600 (quoting § 12101(a)(2)). "Unjustified isolation" is therefore "properly regarded as discrimination based on disability." *Id.* at 597. The Supreme Court held that "discrimination" under § 12132 included "not only disparate treatment of comparably situated persons but also undue institutionalization of disabled persons, *no matter how anyone else is treated.*" *Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) (citing *Olmstead*, 527 U.S. at 597–603).

*Olmstead* dealt only with the problem of unjustified institutional segregation. See *Olmstead*, 527 U.S. at 600. Its rationale, however, reaches more broadly. The Court saw "two evident judgments" in the integration mandate. *Id.* The first is that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* The second is that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

The Court had no occasion to consider whether the same evils it had identified for institutional placements might exist in some settings outside of an institution. This case presents that question: whether isolation in the home for a person "who can handle and benefit from" time out in the general community is also inconsistent with the integration mandate. We see no reason why the same analysis should not apply.

See, *e.g.*, Mark C. Weber, *Home and Community-Based Services,* Olmstead*, and Positive Rights: A Preliminary Discussion,* 39 WAKE FOREST L. REV. 269, 274 (2004) ("As with race discrimination, government-sanctioned separation transmits a strong message that the out-group is inferior and that private discrimination is acceptable.") (citing *Brown v. Bd. of Ed. of Topeka,* 347 U.S. 483, 492 n.5 (1954)); Timothy M. Cook, *The Americans with Disabilities Act: The Move to Integration,* 64 TEMP. L. REV. 393, 441 (1991) (collecting studies concluding that "[t]he research data shows, without doubt … that prejudice is lessened through integration"). Isolation in a home can just as "severely diminish[] the everyday life activities" of people with disabilities. *Olmstead,* 527 U.S. at 601. In fact, although family relations might be enhanced at home if people are around, isolation in a home may often be worse than confinement to an institution on every other measure of "life activities" that *Olmstead* recognized.

In accordance with *Olmstead,* the Department of Justice has released guidance directing that the integration mandate be read broadly. The DOJ's interpretation of the mandate "warrant[s] respect" because Congress gave it the task of issuing the relevant regulations. *Id*. at 597–98. The degree of deference is another matter: *Olmstead* said nothing on the subject. In general, we defer to an agency's interpretation of its own regulation unless the agency's interpretation is "plainly erroneous or inconsistent with the regulation" or "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Christopher v. SmithKline Beecham Corp.,* 132 S. Ct. 2156, 2166 (2012) (quoting *Auer v. Robbins,* 519 U.S. 452, 461–62 (1997)). We see no such flaws in the path that DOJ has taken.

The guidance indicates that the "most integrated setting" is "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." U.S. Dep't of Justice, *Statement of the Department of Justice on the Integration Mandate of Title II of the ADA and Olmstead v. L.C.* (June 22, 2011). It notes that "[i]ntegrated settings are located in mainstream society." *Id.* Such settings "offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible." *Id.*

Under the Guidance, the state might violate the integration mandate if it "operates … programs that segregate individuals with disabilities" or "through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or programs." *Id.* The mandate "extend[s] to persons at serious risk of institutionalization or segregation and [is] not limited to individuals currently in institutional or other segregated settings." *Id.* Finally, so long as any additional services do not cause a fundamental alteration in the state program, the state may be required to provide them; budget cuts can violate the integration mandate. *Id.* Given the integration mandate's maximalist language—it demands "the most integrated setting appropriate," 28 C.F.R. § 35.130(d), which it defines as allowing interaction with non-disabled persons "to the fullest extent possible," 28 C.F.R. pt. 35, App. B—we have no reason not to follow the DOJ's interpretation of the mandate. And the mandate, as

we have noted, logically applies to all settings, not just to institutional settings. It bars unjustified segregation of persons with disabilities, wherever it takes place.

The state responds with a narrow reading of the integration mandate and an unwillingness to engage with the DOJ's interpretation. It argues that the integration mandate covers only claims by people who literally have been institutionalized, and that a person with a disability who is housed in the community is therefore outside its scope. The state insists that "setting" refers only to two kinds of physical structures: an institution or a location in the community. But there is no reason to think that the mandate presents such a crabbed binary. First, "there is nothing in the plain language of the regulations that limits protection to persons who are currently institutionalized." *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) (quoting *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003)). The mandate's text uses the general word "setting" and states that people are entitled to be served "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "most integrated setting appropriate" is "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B.

Just as importantly, there is plentiful evidence that the state's interpretation is incorrect. When interpreting administrative rules, a court asks first "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Exelon Generation Co., LLC v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012). In doing so, the court "giv[es] the words used their ordinary meaning." *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1165

(2014) (internal citation omitted). Neither the ADA nor its regulations specifically define the word "setting." Ordinarily, that word denotes an environment or situation rather than any particular physical structure. See THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1593 (4th ed. 2000) ("The context and environment in which a situation is set; the background."); RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1200 (2d ed. 1999) ("[T]he surroundings or environment of anything."); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1072 (10th ed. 1994) ("[T]he time, place, and circumstances in which something occurs or develops[.]"). The regulation's use of the word "most" (integrated) and its reference to "a" setting also imply more than two possibilities.

If these facts stick a knife in the state's argument, the DOJ guidelines twist it. They specifically include the plaintiffs' two theories within the integration mandate's ambit. Moreover, the ADA and the integration mandate's "protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." *Fisher*, 335 F.3d at 1181. In this case, the plaintiffs' quandary is Kafkaesque: Indiana's institutions can serve only a quarter of the persons with disabilities currently on the CIH waiver alone. Even if the plaintiffs had to be institutionalized, it is quite possible that they could not be.

*Amundson* is not to the contrary. Nowhere did *Amundson* indicate that segregation within the community beyond an institution's walls could not implicate the integration mandate. The *Amundson* plaintiffs did not present such a claim, and so the opinion does not address it. *Amundson* decided instead

that the plaintiffs' claims were not ripe because they had not pleaded sufficient facts to allege that they *were* at serious risk of institutionalization. While some of the *Amundson* plaintiffs had been required to leave group homes, they did "not allege inability to find another group home willing to accept the level of reimbursement" Wisconsin was offering. 721 F.3d at 873–74. Wisconsin had represented that it had "safeguards in place that [would] prevent any plaintiff from being transferred to an institution"; the plaintiffs had not given "sufficient reason to think that these [would] fail." *Id.* at 874. *Amundson* did not mention the DOJ Guidance one way or the other; the state thus overreaches when it contends that *Amundson* "presumably" rejected the DOJ Guidance.

The plaintiffs in our case have provided evidence that they need constant supervision and, despite their best efforts, the services provided under the FS waiver have proved inadequate to prevent life-threatening gaps in care. Again turning to *Amundson*, the state argues that the hypothetical availability of a CIH waiver is a sufficient safeguard. But the state did not present this argument to the district court, and it is therefore waived. See *Domka v. Portage Cnty., Wis.*, 523 F.3d 776, 783 (7th Cir. 2008). Even if it were not, the CIH waiver is among the measures the plaintiffs argue they need to prevent their institutionalization. The plaintiffs have provided evidence that they are at serious risk of being institutionalized. At this point, the state has provided no evidence to the contrary and has decided that the plaintiffs are currently ineligible for the CIH waiver. This is enough to raise a genuine question of fact about the adequacy of the CIH waiver as a safeguard against a serious risk of institutionalization. The plaintiffs' claims are therefore ripe.

Another argument the state advances to avoid the integration mandate rests on language in *Amundson* and a footnote in *Olmstead*, both of which it reads to support the idea that the integration mandate imposes neither a "standard of care" nor "a certain level of benefits to individuals with disabilities." *Olmstead*, 527 U.S. at 603 n.14; *Amundson*, 721 F.3d at 875 (holding that the ADA does not support "a claim of absolute entitlement" to Medicaid benefits); see also *Cohon ex rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 729 (10th Cir. 2011) (holding that ADA did not give plaintiff "legal entitlement" to specific requested services and that she did not state an *Olmstead* claim because she failed to allege that the program would lead to her unjustified isolation or premature institutionalization); *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999) (noting that "*Olmstead* reaffirms that the ADA does not mandate the provision of new benefits" and "addressed only [] *where* Georgia should provide treatment, not *whether* it must provide it").

The problem with that argument is that it misconstrues the plaintiffs' theory. They have not argued that they have an absolute entitlement to any particular services or program. They instead seek access to existing benefits available under either the uncapped A&D or CIH waivers—benefits that have been granted to some persons with disabilities, but not to them. While "a State is not obligated to create new services," it "may violate Title II when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community-integrated setting." *Radaszewski*, 383 F.3d at 609 (citing *Olmstead*, 527 U.S. at 603 n.14 for the principle "that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide"). The plaintiffs seek services that exist and are given to others.

The state may already be providing at least some of those services through the prior-authorization program, albeit not out in the community. That, in fact, is the key difference between waiver and prior-authorization services: the former are more flexible with regard to their timing and may be used outside the home in the community; the latter must be used in the home.

The state's final plea invokes vagueness: If the integration mandate applies to a multiplicity of "settings" and can require the shifting of resources to increase community participation, where will it end? The short answer may be that it ends wherever the state has chosen—this is an anti-discrimination mandate, as we said, not a floor or ceiling. Here, the state has ways to allow otherwise qualified persons to spend upwards of 40 hours per week outside their home and in the community. It thus may not, by invoking the rules of its waiver program, limit qualified persons to only 12 hours in the community each week. That fails to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Based on the purpose and text of the ADA, the text of the integration mandate, the Supreme Court's rationale in *Olmstead*, and the DOJ Guidance, we hold that the integration mandate is implicated where the state's policies have either (1) segregated persons with disabilities within their homes, or (2) put them at serious risk of institutionalization.

B

Because it thought that the integration mandate was not even implicated here, the district court did not reach the question whether it was violated. We, however, must press on, in

light of our conclusion that the mandate is in play. On cross-motions for summary judgment, plaintiffs presented evidence that they were segregated from the community and that the state's 2011 policy was to blame. Without challenging the contentions about the degree of community interaction plaintiffs are receiving, the state presented evidence that showed, in its view, that the 2011 policy change was not the cause of whatever segregation is occurring.

1

We turn once again to *Olmstead* for the proper way to analyze these arguments. It set out a test for determining whether the ADA's integration mandate is violated:

> [U]nder Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when [1] the State's treatment professionals determine that such placement is appropriate, [2] the affected persons do not oppose such treatment, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Olmstead*, 527 U.S. at 607. We have understood this to be the Court's last word on the point. See *Omega Healthcare Inv'rs, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 864 (7th Cir. 2007) (noting that "*Olmstead* stands for the proposition that in order to avoid violating the [ADA], the placement of individuals in community-based settings is appropriate" when the test is

met); *Radaszewski*, 383 F.3d at 608 (noting, without clearly ap-
plying the test, that "the [*Olmstead*] Court agreed" with the
plaintiffs' formulation of it).

The first two elements of the test appear in Section III.A of
the *Olmstead* decision, which commanded a majority of the
Court and is thus binding on us. The Court noted there that
(1) "the State may generally rely on the reasonable assess-
ments of its own professionals in determining whether an in-
dividual 'meets the essential eligibility requirements'" of the
program, and (2) that there exists no "federal requirement
that community-based treatment be imposed on patients who
do not desire it." *Olmstead*, 527 U.S. at 602.

*Olmstead*'s articulation of the third element of the test,
however, represents the thinking of only a plurality of the
Court. Those Justices addressed the question of the level at
which the "reasonable modifications" provision should be
evaluated—that is, which matters should be considered in de-
ciding whether a requirement to provide integrated care
would constitute a fundamental alteration of the state's pro-
gram. See 28 C.F.R. § 35.130(b)(7). It is clear that some version
of the "reasonable modifications" provision—and its flip side,
the fundamental-alteration defense—must be taken into ac-
count before deciding that the integration mandate was vio-
lated. Justice Stevens, concurring in the judgment, thought
that the fundamental-alteration defense rested ultimately on
the facts; he thus saw no need to delve into the limitations on
the state's duty. See *Olmstead*, 527 U.S. at 607–08 (Stevens, J.,
concurring in part and concurring in the judgment). Justice
Kennedy, writing for himself and Justice Breyer, focused on
the need for courts to defer to the treatment decisions of the
treating physicians, lest people who need greater care are

shoved out into the community inappropriately. *Id.* at 608–615 (Kennedy, J., concurring in the judgment).

As long as we bear in mind the cautionary remarks of the concurring Justices, we see nothing to prevent our use of Section III.B of the plurality's opinion as a starting point. Its articulation of the "reasonable modifications" element states a sensible level at which to analyze the question whether requiring integrated services would "fundamentally alter" the nature of the programs. 28 C.F.R. § 35.130(b)(7). On the one hand, a "substantial[] increase" in the cost of a few of plaintiffs' services should not "defeat [a] Title II claim." *Radaszewski*, 383 F.3d at 614. Such a holding would eviscerate the integration mandate. See *id.* ("If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed." (quoting *Fisher*, 335 F.3d at 1183)). On the other hand, looking only at the cost of changing the plaintiffs' care would be unfair to the state and fail to give it the leeway for which Justices Kennedy and Breyer called. "If the expense entailed in placing one or two people in a community-based treatment program is properly measured for reasonableness against the State's entire mental health budget, it is unlikely that a State, relying on the fundamental-alteration defense, could ever prevail." *Olmstead*, 527 U.S. at 603 (plurality opinion).

By specifying that both the "resources available to the State" and "the needs of others with mental disabilities" must be taken into account, the plurality's test allows for a sensitive balance between the interests of the state and the interests of the developmentally disabled persons. The test also prevents a state from describing a program at such a specific level of

detail that literally any change would result in a "fundamental" alteration. In the end, the question under the ADA is a simple one: what effect will changing the state's practices have on the provision of care to the developmentally disabled, taking into account the resources available to the state and the need to avoid discrimination?

The evaluation of whether a change would fundamentally alter the nature of a program should be holistic. Here, the state has produced no evidence that anything approaching a fundamental change would occur if the programs available to these plaintiffs were handled differently. We thus do not regard it as a close case.

2

Neither of the first two elements of the *Olmstead* test is disputed in our case. By previously allowing the plaintiffs significantly more community interaction, the state's medical professionals have demonstrated that such activity is both appropriate and possible. The plaintiffs' purpose in this lawsuit is to have this level of community-based service restored, under whatever program umbrella will accomplish that end. The plaintiffs' evidence shows that at present, using the FS waiver, they can arrange for no more than 10 to 12 hours of such services per week. The affidavits maintain that this amount is insufficient either (1) to allow any significant community interaction or (2) to prevent gaps in supervision that remained uncovered by their caretakers or prior-authorization services. The state has offered nothing to support its assumption that the plaintiffs actually spend more time in the community than their guardians have averred. Plaintiffs have also provided evidence that a more integrated setting is possible: their affidavits state that they were able both to achieve significantly

more community interaction and prevent gaps in supervision under the A&D waiver.

It is the state's burden to prove that the proposed changes would fundamentally alter their programs. See *Radaszewski*, 383 F.3d at 611 (citing 28 C.F.R. § 35.130(b)(7)). It has failed to carry that burden here. In fact, it did not even argue that the plaintiffs seek fundamental alteration of their programs. Instead, it contended that "it is not 'reasonable' to demand that the State alter the eligibility requirements for the A&D Waiver so as to permanently enshrine its error" in placing the plaintiffs on the waiver in the first place.

There are several problems with this argument. The first is that the plaintiffs are not asking to be put back on the A&D waiver. While that may be one of the outcomes they will accept, it is not the only one. The second is that the state's logic is circular. After all, the state creates the waiver programs, and therefore those programs' eligibility criteria. If the state's own criteria could prevent the enforcement of the integration mandate, the mandate would be meaningless. The regulation adjacent to the "reasonable modifications" provision anticipates—and directly confronts—this problem. See 28 C.F.R. § 35.130(b)(8) ("A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."). The state has made no showing that its criteria are "necessary for the provision" of the relevant services in this case. It cannot avoid the integration mandate by binding its hands in its own red tape.

The third reason the state's argument cannot prevail is the most important: the evidence presented on summary judgment shows that the plaintiffs' demands are entirely reasonable; the state has provided no evidence to the contrary. The plaintiffs do not demand a significant increase in total services, but rather a different apportionment of the two kinds of services they already receive. Prior-authorization services do not allow the plaintiffs to be taken into the community. Waiver services do. Allowing the plaintiffs to change their "mix" of prior-authorization and waiver services would allow them to participate more fully in the community. According to their affidavits, a relatively slight increase in total services would prevent them from being unsupervised. The state has provided no evidence that the plaintiffs' desired distribution of services would significantly increase their cost, let alone fundamentally alter any programs.

Finally, the state argues that it should be excused from changing its waiver system because it has a "comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings," and therefore meets the reasonable-modification standard. *Olmstead*, 527 U.S. at 605. The state is referring to the process it is using to move persons with disabilities from the A&D waiver to the FS waiver. That is just what plaintiffs are attacking: their evidence shows that this "plan" is undermining, not furthering, the integration mandate. Instead of moving people with disabilities to more integrated settings, the state's plan is making their living arrangements *less* integrated.

3

The plaintiffs have provided evidence that before the policy change, they were receiving the kind of services they

needed to prevent isolation or institutionalization and participate in the community around them. They also have provided evidence that the FS waiver services that they currently receive are insufficient to allow more than limited trips into the community. They describe current or future gaps in services that plausibly put them at risk of institutionalization.

It also appears, however, that recipients of FS waiver services may choose how to spend their allowance. The state argues that the FS waiver actually provides the plaintiffs sufficient waiver services to participate in the community, but that these plaintiffs have used the FS resources in a way that has led to their current isolation. In support of this contention, the state has offered evidence that the plaintiffs could make different choices that would allow them more services in the community. It also offered evidence that the Coles are using a lower dollar amount of services than they did under the A&D waiver, and that Maertz's situation has been influenced by the fact that his sister is the paid provider of his waiver services. There is therefore a dispute of material fact as to whether the state's 2011 policy change caused the plaintiffs' isolation, and summary judgment is inappropriate on that question. See FED. R. CIV. P. 56(a).

## III

The party seeking class certification bears the burden of showing, by a preponderance of the evidence, that a proposed class meets the requirements of Federal Rule of Civil Procedure 23. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). The district court's decision whether to certify a class is reviewed for abuse of discretion. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). The plaintiffs proposed the following class:

> Any and all persons, current and future, termi-
> nated from the [A&D waiver] as a result of the
> 2011 Policy Change who require more services
> each year than are available through the [FS
> waiver] and who are not enrolled in the [CIH
> waiver].

The district court found that the plaintiffs failed all of Rule 23's criteria. We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record. *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 647 (7th Cir. 2011). Because the class definition was too vague, we find that the district court did not abuse its discretion in denying class certification.

The vagueness of this definition arises from the word "require." The question is in what ways do the potential class members "require" more services than available under the FS waiver? Are they medically required? Required for regular community interaction? Required so as not to violate the integration mandate? (The last of these definitions would risk making this class an impermissible "fail-safe" class. See *Mullins*, 795 F.3d at 660.) The class definition does not say.

Avoiding vagueness is important "because a court needs to be able to identify who will receive notice, who will share in any recovery, and who will be bound by a judgment." *Mullins*, 795 F.3d at 660. "To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.* The proposed definition here sufficiently identifies the time, location, and manner of harm, but we cannot say the same for the "particular group." *Id.* Without knowing how to

sort between those who were and those who were not deprived of services to which they were entitled, we would not be able to say who should receive notice, be bound by the judgment, and, if the class were to prevail on the merits, share in any recovery. The district court therefore did not abuse its discretion in denying class certification.

## IV

Our decision today does not require the state of Indiana to adopt any particular solution to make its waiver program compliant with the integration mandate. If plaintiffs prevail on the merits, the district court, in conjunction with the parties, may exercise its equitable powers to craft an appropriate injunction. But the state cannot avoid the integration mandate by painting itself into a corner and then lamenting the view. The state designs, applies for, develops policies regarding, and executes its waiver programs. If those programs in practice allow persons with disabilities to leave their homes only 12 hours each week, cooping them up the rest of the time, or render them at serious risk of institutionalization, then those programs violate the integration mandate unless the state can show that changing them would require a fundamental alteration of its programs for the disabled.

Because the plaintiffs' claims both fit within and, if caused by the state's policy, represent violations of the integration mandate, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion. We AFFIRM the district court's decision not to certify the proposed class. Costs will be taxed against the state.