WOOD, Chief Judge.
They say every dog has its day. This case is about a dog — specifically, Emma, a black Labrador. Emma lived in Indiana with Anthony and Jeanette Van de Venter, friends of David Williams. When Williams, then visiting the Van de Venters, took Emma outside so that she could relieve herself, she raced off toward an enticing sound and Williams was injured. Before us is the question whether American Family Mutual Insurance (AmFam), the Van de Venter’s home insurer, must cover Williams’s medical expenses. AmFam said no and brought this suit for a declaratory judgment to confirm its reading of the policy. The district court, however, found in favor of the Van de Venters and Williams. We affirm.
I
The relevant facts are undisputed. In October 2012, Williams, a college friend of Anthony Van de Venter, visited the Van de Venters at their home in Monroe County, Indiana. On Tuesday, October 23, 2012, the Van de Venters went to work, leaving Williams at home for the day. Williams was sharing the house with Emma. Before they left, the Van de Venters told Williams that Emma would be fine inside while they were away. If she wanted to go outside, they instructed him, she would ring a bell by the front door, and he should let her out. They said nothing about walking her.
At approximately 10:40 a.m., Williams was watching . television when Emma scratched on his bedroom door. He followed her downstairs, clipped a leash to her collar, and accompanied' her outside. They returned without incident. Roughly an hour later, Williams heard the bell at the front door ring. He went downstairs again to find Emma by the door, whining. He again affixed the leash to her collar and walked with her into the backyard, away from the road.
As Williams held Emma’s leash, a “woof’ rang out, shattering the early-afternoon air. That neighborhood dog’s bark proved to be, quite literally, worse than its bite: Emma lurched toward the sound, pulling Williams to the ground and seriously injuring his shoulder. Williams sued the Van de Venters, alleging that they were negligent in, among other things, failing to exercise reasonable care for his safety while he was a guest in their home.
At the time of Williams’s injury, the Van de Venters’ home was insured by a home-insurance policy with AmFam. The policy included personal liability coverage indemnifying the Van de Venters for compensatory damages for bodily injury and guaranteeing a defense against suits for such damages. The policy also contained a provision stating: “Intra-Insured Suits. We will not cover bodily injury to any insured.” In relevant part, the policy defined an “insured” as “any person ... legally responsible for a[n] ... animal owned by [a named insured or resident relative of a named insured] to which [the policy’s personal-liability coverages] apply.”
AmFam took the position that these provisions relieved it of the duty to defend or *648 indemnify the Van de Venters. As we noted, the district court rejected its position, and AmFam now appeals.
II
We review the district court’s decision- to grant summary judgment de novo. Steimel v. Wemert, 823 F.3d 902, 910 (7th Cir. 2016). When reviewing cross-motions for summary judgment, we take the motions one at a time and for each one we construe all facts and draw all reasonable inferences in favor of the non-moving party. Id. Summary judgment is appropriate only “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a).
AmFam argues that Williams was legally responsible for Emma at the time he was hurt, and for that reason he was an insured under the policy. As an insured, it concludes, he cannot turn to the policy for coverage of his claim.
In diversity cases where neither party raises a conflict of law issue, federal courts apply the law of the state in which they sit. Ball v. Kotter, 723 F.3d 813, 821 (7th Cir. 2013). This is such a case. Indiana uses the law of the principal location of the insured risk. Dunn v. Meridian Mut. Ins. Co., 836 N.E.2d 249, 251 (Ind. 2005) (citing Restatement (Seoond) of Conflict of Laws § 193 (1971)). The Van de Venters’ house is located in Indiana, and so we rely on Indiana law.
If not specifically defined in the policy, clear and unambiguous language is given its ordinary meaning. See Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co., 983 N.E.2d 574, 577 (Ind. 2013). The policy does not define the term “legally responsible,” nor does it otherwise indicate that the term has a specific meaning. We therefore turn, as Indiana courts would, to the dictionary. Id. at 579. Black’s Law Dictionary defines “responsibility” as the “quality, state, or condition of being answerable or accountable; Liability.” Black's Law Dictionary 1506 (10th ed. 2014). “Liability,” in turn, means “legal responsibility to another or to society, enforceable by civil remedy or criminal punishment.” Id. at 1053. To the same effect, Merriam-Webster defines “responsible” as “liable or subject to legal review or in case of fault to penalties.” MeRriam-Webster’s Third New Int’l Dio-tionary 1935 (1986). When used in the legal sense, “responsible” means roughly “subject to some kind of liability.”
Indiana law makes two kinds of people legally responsible for animals: owners and keepers. Ross v. Lowe, 619 N.E.2d 911, 914 (Ind. 1993) (“An owner or keeper who fails to exercise ... reasonable care may be liable in negligence for the manner of keeping and controlling the dog.”). Indiana Code § 15-20-1-2 defines an “owner” as “a person who possesses, keeps, or harbors a dog.” A “keeper, for purposes of imposition of liability, is one who exercises control over an animal on his premises with knowledge of its presence, whether he be an owner, or bailee.” Williams v. Pohlman, 146 Ind.App. 523, 257 N.E.2d 329, 331 (1970). In Vetor by Weesner v. Vetor, 634 N.E.2d 513, 515 (Ind. Ct. App. 1994), the court held that a jury could find that the victim’s grandparents were a dog’s keeper where they had “not simply acquiesced but were intentionally causing the dog to come to their home.” Id. (noting that they permitted the dog to “roam their farm,” fed and watered it, and gave it affection). In order to qualify as a keeper, a person must “undertake! ] to manage, control, or care for the animal as [an] owner, in general, is accustomed to do.” 3B C.J.S. Animals § 75. The definition therefore “implies ... a substantial number of incidents” and that the person “supplies the dog] with the necessities of life.” Id. A person “harbors” a dog when *649 she “affords [it] lodging, shelters, or gives refuge ... for a limited purpose or time.” Id. § 374.
Whatever the limits of these definitions, they are not met here. Because Emma was not on Williams’s property, he did not harbor her. Neither did he undertake any control of her that would approximate that of an owner. He did not intentionally cause her to come to any area of the house. Indeed, she rang the bell at the front door, signaling that she wished to go outside. He merely attached her leash and accompanied her there. Williams was not responsible for giving Emma any food, water, affection, or other care — and he gave her none. Except for the brief moments when he walked outside with her, he did not interact with Emma at all. Even then, it seems that his physical control was very limited: their first contest of wills resulted in his injury.
Finally, Williams did not have “possession” of Emma under any traditional definition of the word. He did not “exercise dominion over” Emma; neither did he assert a “right under which” he “exercise[d] control over” her “to the exclusion of all others.” Possession, Blagk’s Law Dictionary at 1351. Williams was just a house-guest who twice accompanied his host’s dog outside as it did its business: he did not possess, keep, or harbor Emma.
AmFam pushes back with the argument that Williams was “legally responsible” for Emma because the Van de Venters granted him a bailment over her. There are several problems with this theory. First, Indiana" law seems to consider bailees of animals to be a subset of keepers. See Williams, 257 N.E.2d at 331. If Williams was not a keeper, he could not have been a bailee. More fundamentally, Williams does not meet Indiana’s requirements for a bailee. “A bailment arises when: (1) personal property belonging to a bailor is delivered into the exclusive possession of the bailee and (2) the property is accepted by the bailee.” Kottlowski v. Bridgestone/Firestone, Inc., 670 N.E.2d 78, 82 (Ind. Ct. App. 1996). Delivery requires “full transfer ... of the property to the bailee as to exclude the owner and all other persons.” Id. “Acceptance requires either an express contract to take the article and later redeliver it, or circumstances from which such a contract can be implied.” Id.
None of these things happened in this case. Emma was not transferred to Williams at all, let alone to the exclusion of the Van de Venters. Under the undisputed terms of Williams’s and the Van de. Ven-ters’ understanding, Williams and Emma simply coexisted in the house during the Van de Venters’ absence. Neither did Williams expressly or impliedly agree to “take” Emma. Quite literally, Williams let a sleeping dog lie — or do whatever else it was doing. The Van de Venters could have come back at any time and, on a whim, taken her away. They could have sent someone else to walk, feed, or take her out. AmFam wants us to pvaluate in isolation the periods during which Williams accompanied Emma outside, disregarding the rest of their day together. But doing so does not accurately reflect their relationship (or lack thereof). Despite spending all day in the same house, Williams’s only interactions with Emma took place when he twice affixed a leash to her collar, and for a few minutes, accompanied her outside, exercising at most limited control over her movements.
Even if it were not cleqr that Williams was not legally responsible for Emma, there would be strong reasons to reject AmFam’s owner, keeper, and bailment theories. First, AmFam’s theory would lead to absurd results: it would render an unsuspecting bystander legally responsible for the dog whose leash he holds while the *650 dog owner ties her shoe. In fact, nearly anyone who tried to control a dog, even for moments, at the behest of the owner would be legally responsible.
Moreover, fitting Williams’s conduct within the term “legally responsible” would take all the bite out of its meaning in the policy. If any person exercising any control over an animal were legally responsible for it under the policy, then nearly all interactions with animals would be excluded from policy coverage. The in-tra-insured provision was not meant to preclude coverage of every guest or business invitee who drops by the house and even momentarily controls the dog.
Exclusions of coverage must be “clearly expressed to be enforceable.” State Auto. Mut. Ins. Co. v. Flexdar, Inc., 964 N.E.2d 845, 848 (Ind. 2012). Where they are not, “the policy will be construed most favorably to the insured.” Id. (internal citation omitted). If AmFam had intended “legally responsible” to reach so broadly, it should have used more specific language. Indiana follows the rule that . “[p]olicy terms are interpreted from the perspective of an ordinary policyholder of average intelligence.” Allgood v. Meridian Sec. Ins. Co., 836 N.E.2d 243, 246 (Ind. 2005). An average policyholder would not consider a houseguest legally responsible for a dog merely because she agreed to take it out to relieve itself, and while doing so, held it by a leash. To the extent reasonable people could differ on the matter, the term must be construed against AmFam. Id.
AmFam’s citations to non-Indiana authorities fail to support its contention that Indiana would regard Williams as Emma’s keeper. See, e.g., Malik v. Am. Family Mut. Ins. Co., 243 Wis.2d 27, 625 N.W.2d 640, 642 (Wis. Ct. App. 2001) (plaintiff legally responsible for dog where he took it to his house and cared for it during owner’s week-long vacation); Van Kleek v. Farmers Ins. Exch., 289 Neb. 730, 857 N.W.2d 297, 303-04 (2014) (dogsitter legally responsible for dog where he was completely responsible for dog’s care during owners’ four-day vacation). The Utah case the district court found persuasive, Neztsosie v. Meyer, is closer to this one. See 883 P.2d 920, 921 (Utah 1994). Neztosie held that a grandfather who checked on a dog’s food and water while its owners were out of town was not a keeper, noting that the term “implies the exercise of a substantial number of the incidents of ownership.” Id. (citing McEvoy v. Brown, 17 Ill.App.2d 470, 150 N.E.2d 652, 656 (1958) (“The casual act of feeding or watering the dog is not such an act that would constitute keeping or harboring.”)).
Finally, AmFam cites a dog’s breakfast of Indiana common and municipal law theories, none of which indicates that a person’s fleeting physical control over an animal can make her liable for the animal’s actions. Williams’s use of a leash does not in itself give rise to a legal duty under Indiana law. Even if Williams had what AmFam terms “care, custody, and control” over Emma at the time of his injury, this status is not connected to any theory of liability under Indiana law. AmFam’s res ipsa loquitur argument is waived. See D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793, 800 (7th Cir. 2015) (arguments not raised below are waived). And its assorted citations to state, county, and municipal law are inapposite. See, e.g., Burgin By & Through Akers v. Tolle, 500 N.E.2d 763, 766 (Ind. Ct. App. 1986) (common-law duty of owner or keeper); Ross, 619 N.E.2d at 914 (same); Monroe Cnty. Code §§ 440-12-17 (subjecting owners to potential liability); Bloomington Code § 7.24.040 (penalty paid by owner/guardian).
Ill
Williams was not Emma’s owner, keeper, or bailee. He was therefore not “legally *651 responsible” for her under Indiana law, not an insured under the policy, and not precluded from coverage by the policy’s provision barring intra-insured suits. Am-Fam owes duties to defend and indemnify the Van de Venters against Williams’s suit arising from his injuries. The judgment of the district court is AFFIRMED.