Matter of Oceanview Home for Adults, Inc. v Zucker (2025 NY Slip Op 00805)

Matter of Oceanview Home for Adults, Inc. v Zucker

2025 NY Slip Op 00805

Decided on February 13, 2025

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 13, 2025

No. 6 

[*1]In the Matter of Oceanview Home for Adults, Inc., & c., Appellant,
v
Howard Zucker, & c., Respondent, et al., Respondent.

Michael Y. Hawrylchak, for appellant.
Gary J. Malone, for respondent Howard Zucker, & c.

HALLIGAN, J.

The State of New York's Department of Health (DOH) licenses certain facilities known as "adult homes" to provide "long-term care, room, board, housekeeping, personal care and supervision to five or more adults unrelated to the operator" (Dept of Health Regs [18 NYCRR] § 485.2 [b]). Regulations promulgated by DOH provide that an adult home may not admit additional residents with serious mental illness if it has a capacity of 80 or more beds and its resident population is over 25% persons with serious mental illness (id. § 487.4 [d]; see also id. § 487.2 [c]). Oceanview Home for Adults, Inc., an adult home subject to this admissions cap, claims that those regulations discriminate against persons with disabilities in violation of the Fair Housing Act Amendments of 1988 (FHAA), which extended the protections of the Fair Housing Act (FHA) to persons with disabilities (see 42 USC § 3604 [f] [1]-[2]). We conclude that plaintiff has failed to establish that the challenged regulations facially discriminate against persons with disabilities, and therefore affirm.
I.

We begin with a brief history of the challenged regulations. In 1999, the United States Supreme Court held in Olmstead v L.C. ex rel. Zimring that the Americans with Disabilities Act (ADA) required Georgia to move two individuals whose psychiatrists had determined they were fit for "community placement" from institutional housing into a community setting, reasoning that "[u]njustified isolation . . . is properly regarded as discrimination based on [*2]disability" under the ADA (527 US 581, 587, 593-595, 597 [1999]). The Court noted Congress's findings that "historically, society has tended to isolate and segregate individuals with disabilities," and that "individuals with disabilities continually encounter various forms of discrimination, including . . . segregation" (id. at 600, citing 42 USC § 12101 [a] [2], [a] [5]). It concluded that the ADA imposes an affirmative obligation on the states to prevent the segregation of persons with disabilities in institutionalized settings that are more restrictive than appropriate for their needs (id. at 597-603). Related regulations promulgated by the Department of Justice (DOJ) pursuant to the ADA require that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" (28 CFR 35.130 [d]).
Following Olmstead, a number of courts held that the ADA and its implementing regulations impose a broad "integration mandate" on the states, which is violated by "[a] failure to provide placement in a setting that enables disabled individuals to interact with non-disabled persons to the fullest extent possible" (e.g. Joseph S. v Hogan, 561 F Supp 2d 280, 289-290 [ED NY 2008] [internal quotation marks omitted], citing Messier v Southbury Training Sch., 1999 WL 20910 at *9 [D Conn Jan. 5, 1999]; see also Helen L. v DiDario, 46 F3d 325, 335-336 [10th Cir 1995]). This integration mandate has underpinned various challenges to state policies or practices that contribute to the segregation of the mentally ill (see Steimel v Walmart, 823 F3d 902, 910-914 [7th Cir 2016] [plaintiffs alleged that change in Indiana's provision of Medicaid services would reduce their ability to participate in community activities]; Guggenberger v Minnesota, 198 F Supp 3d 973, 1026-1030 [D Minn 2016] ["the integration mandate's application is not limited to the context of institutionalization"]; Lane v Kitzhaber, 841 F Supp 2d 1199, 1205 [D Or 2012] [allegations concerning segregation in employment facilities]), including practices which create an undue risk of institutionalization (see M.R. v Dreyfus, 697 F3d 706, 720 [9th Cir 2012]; Fisher v Oklahoma Health Care Auth., 335 F3d 1175 [10th Cir 2003]; Hiltibran v Levy, 793 F Supp 2d 1108 [WD Mo 2011]).
In 2009, a federal court held that DOH's licensing regime governing adult homes violated the ADA as applied to persons with mental illness (Disability Advocates, Inc. v Paterson, 653 F Supp 2d 184, 187-188 [ED NY 2009] [hereinafter DAI]). The DAI lawsuit was targeted at "adult homes in New York City with more than 120 beds and in which twenty-five residents or 25% of the resident population (whichever is fewer) have a mental illness" (id. at 187). After a lengthy trial, the federal district court concluded that "virtually all" members of the subject group ("people with mental illness residing in, or at risk of entry into" the targeted adult homes) were "qualified" to receive mental health services in the more integrated setting of "supported housing" (id. at 187-188). The court further determined that the large adult homes at issue contributed to the segregation of persons with mental illness by limiting their opportunities to interact with persons without mental illness, discouraging them from integrating into the community, and fostering "learned helplessness" (id. at 208-216). Although the trial court's decision in DAI was vacated by the Second Circuit on standing grounds, the Second Circuit recognized that litigation might continue (675 F3d 149, 152, 162 [2d Cir 2012]).
The regulations at issue here were promulgated around this time. In August and October of 2012, the Chief Medical Officer of the State's Office of Mental Health (OMH) issued two Clinical Advisories stating that certain large adult homes, known as transitional adult homes, "result in housing experiences that are not clinically appropriate to the needs of such persons and are not conducive to their rehabilitation or recovery" (Lloyd I. Sederer, Clinical Advisory, at 1 [Aug. 8, 2012], available at 
https://omh.ny.gov/omhweb/advisories/; see also Lloyd I. Sederer, UPDATE — Clinical Advisory Regarding Adult Homes Previously Issued to Psychiatric Inpatient Programs on August 8, 2012 [Oct. 1, 2012], available at 
https://omh.ny.gov/omhweb/advisories/). Shortly thereafter, DOH issued the challenged regulations, which defined a "transitional adult home" as an adult home with a bed capacity of 80 or more residents and with a proportion of 25% or more of the resident population having "serious mental illness" (see 18 NYCRR § 487.13 [b] [1]). The regulations prohibited these facilities from admitting any persons with serious mental illness until and unless the proportion of the resident population with serious mental illness fell below the 25% threshold (id. § 487.13 [c]-[j]), and required the homes to develop a "compliance plan" to reduce their "mental health census" (that is, the proportion of current residents who are persons with serious mental illness) (id. § 487.13 [b] [4], [c]). The regulations define "persons with serious mental illness" as individuals who have a designated diagnosis of a mental illness that is included in the DSM-V, the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association, "and whose severity and duration of mental illness results in substantial functional disability" (id. § 487.2 [c]). Subsequent guidance from DOH defines a serious mental illness with reference to various functional limitations, impairments, and symptoms (see 2022 NY Slip Op 34546[U], *12-*13 [Sup Ct, Albany County 2022]).
After the regulations were promulgated, DOJ and a group of private plaintiffs filed a lawsuit with claims that were substantially identical to those presented in DAI (see United States v New York, 2014 WL 1028982 [ED NY, Mar. 17, 2014, Nos. 13-CV-4165, 13-CV-4166]; 215 AD3d 140, 143 [3d Dept 2023]). A proposed settlement agreement referenced the new regulations and required the State to expand its supported housing capacity by at least 2,000 beds and take other affirmative steps to encourage the adoption of supported housing for persons with mental illness (United States v New York, 2014 WL 1028982 at *2, *5). The settlement was approved in 2014 (id.) and has since been amended several times. In a subsequent ruling, the court observed that the regulations were "critical to achieving the goals of the Settlement Agreement" (United States v New York, 2017 WL 2616959 at *1 n 3 [ED NY, June 15, 2017, Nos. 13-CV-4165, 13-CV-4166, 16-CV-1683]). No condition of the settlement—and no regulation at issue here—required any adult home to discharge a person with mental illness.
Turning to the dispute before us, DOH cited plaintiff in 2016 for admitting persons with serious mental illness in violation of the regulations (215 AD3d at 145). Plaintiff brought this combined declaratory judgment action and CPLR article 78 proceeding, alleging, among other things, that the restriction on admission of residents with serious mental illness violated the FHA, as amended by the FHAA. Before the trial court, the DOJ filed a Statement of Interest in support of the challenged regulations. DOJ argued that because the regulations governed "the types of services and settings the State determined it would provide" and rested on a professional determination that transitional adult homes were "clinically and therapeutically ineffective" for persons with serious mental illness, they did not "deny" or "make unavailable" housing within the meaning of the FHA (Index No. 906012-16, Ny St Cts Elec Filing [NYSCEF] Doc No. 187, DOJ Statement at 11-14). DOJ also argued that the regulations would pass muster under existing federal circuit court precedent establishing other exceptions to the scope of the FHAA (id. at 15).
Supreme Court, among other things, held that the regulations violated the Fair Housing Act. The Court applied a line of federal circuit court decisions holding that discrimination against persons with disabilities may be permissible under the FHA if "narrowly tailored" to benefit the protected class (2022 NY Slip Op 34546[U] at *3-*5, *68-*75, citing Community House, Inc. v. City of Boise, 490 F3d 1041, 1048 [9th Cir 2007], Larkin v Michigan Dept. of Social Services, 89 F3d 285, 291 [6th Cir 1996], and Bangerter v Orem City Corp., 46 F3d 1491, 1503-1504 [10th Cir 1995]; see also U.S. v City of Chicago Heights, 161 F Supp 2d 819, 833 [ND Ill 2001]; Human Resource Research and Management Group, Inc. v County of Suffolk, 687 F Supp 2d 237 [ED NY 2010]). Supreme Court concluded that the regulations were not permissible under this standard for two reasons: first, Olmstead's integration mandate did not require them, and second, they were not narrowly tailored because alternative approaches, such as allowing persons with serious mental illness to make an "informed choice" to live in transitional adult homes, were available (id. at *42).
The Appellate Division reversed, dismissed the proceeding and declared that the regulations do not violate the Fair Housing Act (215 AD3d 140 [3d Dept 2023]). It agreed with Supreme Court that the challenged regulations were facially discriminatory and applied the same legal framework, but concluded that the regulations had been adopted to implement Olmstead's integration mandate and were narrowly tailored (215 AD3d at 148-152). Although Supreme Court had accorded little weight to the testimony given by the State's experts, the Appellate Division found that testimony both credible and relevant (id. at 151-152). Exercising its "broad authority to independently evaluate the evidence and render a judgment warranted by the facts," the Appellate Division found the trial evidence showed that transitional adult homes "are not beneficial to recovery for people with serious mental illness" and that "smaller facilities are beneficial to the recovery of people with serious mental illness" (id.). Accordingly, the Appellate Division upheld the regulations.
The Appellate Division granted plaintiff leave to appeal.
II.

The FHAA, enacted in 1988, amended the FHA to add disability as a protected classification (see 42 USC § 3604 [f] [1]) (making it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter" because of disability). The FHAA also defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling" (id. § 3604 [f] [3] [B]). The legislative history of these amendments indicates that they were intended to "end the unnecessary exclusion of persons with handicaps from the American mainstream" (HR Rep 711, 100th Cong, 2d Sess at 18, reprinted in 1988 US Code Cong & Admin News at 2173, 2179).
The parties sharply disagree about the standard for adjudicating the FHA claim before us, including whether the FHA incorporates an implied exception for so-called "benign discrimination" and what the contours of a narrow tailoring inquiry might be in the context of such an exception. We do not need to resolve these thorny questions, though, because we hold that plaintiffs have not demonstrated that the regulations "deny" or "make unavailable" housing on the basis of a person's disability (see 42 USC § 3504 [f] [1]).
The challenged regulations concern the type of institutional setting in which services for persons with serious mental illness may be provided, and in this respect, differ from zoning or permitting requirements used to confine persons with disabilities to particular locations and separate them from others. OMH's Chief Medical Officer concluded that large adult homes "are not clinically appropriate settings for the significant number of persons with serious mental illnesses who reside in such settings, nor are they conducive to the rehabilitation or recovery of such persons" (Sederer, Clinical Advisory, at 1 [Aug. 8, 2012]; see also Sederer, UPDATE — Clinical Advisory Regarding Adult Homes Previously Issued to Psychiatric Inpatient Programs on August 8, 2012 [Oct. 1, 2012]). DOH licenses these homes, and implemented an admissions bar based on the proportion of residents with serious mental illness in such facilities in line with OMH's judgment (see 215 AD3d at 151-152).
As the Appellate Division concluded, the admissions cap reflects a professional judgment about what settings are clinically and therapeutically effective for persons with serious mental illness (215 AD3d at 153). By giving those individuals "greater ability to exercise autonomy and interact with individuals who do not have serious mental illness," the regulations further the goal of ending unnecessary exclusion of persons with disabilities (215 AD3d at 146-150). Moreover, we note that the FHAA defines discrimination to include "a refusal to make reasonable accommodations policies or services" as necessary for persons with disabilities to "use and enjoy" a dwelling (42 USC § 3604 [f] [3] [B]), and the Appellate Division determined that the admissions cap reflects a "reasonable modification[] to the State's provision of services" intended to eliminate discrimination against persons with disabilities (215 AD3d at 154).
Nor is the clinical determination embodied in the regulations unusual. As a general matter, disability services are subject to various conditions and limitations, including the type of facility in which services may be provided, and the State frequently relies upon the "reasonable medical judgment[]" of its public health officials as to how best to administer such services (215 AD3d at 152, quoting Olmstead, 527 US at 602). Indeed, other DOH regulations limit admission to all adult homes on various grounds that concern the particular needs of the person seeking admission or the nature of their disability (see e.g. 18 NYCRR § 487.4 [c] [1]-[2], [h] [3] [medical evaluation of prospective resident must certify that resident does "not require placement in a hospital or residential health facility"]; id. § 485.2 [a] [adult homes must serve "adults who . . . are, by reason of physical or other limitations associated with age, physical or mental disabilities or other factors, unable or substantially unable to live independently"]). And large portions of the Mental Hygiene Law, Articles 29 and 31, regulate the operation of multiple types of facilities for persons with mental disabilities, including admission and discharge from those facilities (see e.g. Mental Hygiene Law § 29.07 [a] [Commissioner of OMH may defer admissions to any in-patient facility "when the total number of patients therein exceeds its capacity to an extent which will not permit adequate care"]).
Finally, we note that no evidence in the record before us suggests that the admissions cap rests on stereotypes, prejudice, or fear about persons with serious mental illness.
For these reasons, we conclude that plaintiff has failed to mount a successful facial challenge and we conclude that the challenged regulations do not "deny" or "make unavailable" housing on the basis of disability for purposes of the FHA. Accordingly, the order of the Appellate Division should be affirmed, with costs.
Order affirmed, with costs. Opinion by Judge Halligan. Chief Judge Wilson and Judges Rivera, Cannataro and Troutman concur. Judges Garcia and Singas concur in result and agree with the conclusion in section II that plaintiffs have not met their burden to show that, on their face, the regulations violate the Fair Housing Act.
Decided February 13, 2025